# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

|  |  |  |
|---|---|---|
| JAMES D'CRUZ; NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., AMERICA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **Case No. 5:10-cv-00141-C** **Judge Sam R. Cummings** |
| STEVEN MCCRAW, in his official capacity as Director of the Texas Department of Public Safety, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## ORAL ARGUMENT REQUESTED

Fernando M. Bustos
State Bar No. 24001819
LAW OFFICES OF FERNANDO M. BUSTOS,
P.C.
P.O. Box 1980
Lubbock, TX 79408-1980
Tel: (806) 780-3976
Fax: (806) 780-3800
Email: fbustos@bustoslawfirm.com

Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

Brian Koukoutchos*
28 Eagle Trace
Mandeville, LA 70471
Tel: (985) 626-5052
Email: bkoukoutchos@gmail.com

*Admitted *pro hac vice*.

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 4

    I.     REGULATORY BACKGROUND ................................................................. 4

    II.    PLAINTIFFS' BACKGROUND ................................................................... 6

ARGUMENT ........................................................................................................... 7

    I.     THIS COURT SHOULD EMPLOY THE ANALYSIS APPLIED BY THE SUPREME
          COURT IN *HELLER*, WHICH CONSISTS OF TEXTUAL ANALYSIS AND
          HISTORICAL INQUIRY ATTUNED TO THE PARTICULAR FIREARMS
          REGULATION BEING CHALLENGED. .......................................................... 7

    II.    THE SECOND AMENDMENT PRESERVES THE FUNDAMENTAL RIGHTS OF ALL
          LAW-ABIDING ADULTS, INCLUDING THOSE BETWEEN THE AGES OF 18 AND 21. ..... 9

          A.     Text and History:  The Second Amendment's Prefatory Clause ................ 9

          B.     Text and History: The Second Amendment's Operative Clause ............... 13

    III.   TEXAS' LAW INFRINGES PLAINTIFFS' RIGHT TO BEAR ARMS. ................................ 18

          A.     The Right to Carry Firearms is not Limited to Narrowly Circumscribed
                Locations. ........................................................................................ 18

          B.     Texas' Prohibition Cannot be Squared with Limitations Historically
                Understood as Consistent with the Second Amendment. ....................... 26

    IV.   TEXAS' PROHIBITION ON 18-TO-20-YEAR-OLDS CARRYING HANDGUNS
          CANNOT SURVIVE ANY LEVEL OF HEIGHTENED SCRUTINY. ................................ 32

          A.     Only Strict Scrutiny Would Be Consistent With *Heller*. ......................... 32

          B.     Under *Heller*, Intermediate Scrutiny Is Unacceptable For Laws, Like
                Those Challenged Here, That Infringe the Core Second Amendment
                Right of Armed Self-Defense by Law-Abiding Citizens. ......................... 35

          C.     An "Undue Burden" Analysis Is Simply Another Form of the
                Interest-Balancing That Was Emphatically Rejected in *Heller*. ................ 37

i

D.      The Texas Prohibition Fails Any Level of Heightened Scrutiny...............38

V.      THE TEXAS PROHIBITION ON HANDGUN CARRIAGE DENIES THE EQUAL
        PROTECTION OF THE LAW TO LAW-ABIDING ADULTS UNDER THE AGE OF 21........44

CONCLUSION.....................................................................................................................47

## **TABLE OF AUTHORITIES**

**Cases**                                                                                              **Page**

*Adarand Constructors, Inc. v. Pena,* 515 U.S. 200 (1995)............................................................45

*Andrews v. State*, 50 Tenn. 165 (1871)......................................................................................32

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) ..................................................................28

*Bellotti v. Baird*, 443 U.S. 622 (1979) ......................................................................................16

*Bliss v. Commonwealth*, 12 Ky. 90 (1822) ................................................................................31

*Burdick v. Takushi*, 504 U.S. 428 (1992)...................................................................................35

*Carey v. Population Services International*, 431 U.S. 678 (1977) .........................................14, 15

*Christian v. State*, 37 Tex. 475 (1872)......................................................................................39

*Clark v. Jeter*, 486 U.S. 456 (1988).....................................................................................38, 44

*Craig v. Boren*, 429 U.S. 190 (1976)....................................................................................46, 47

*District of Columbia v. Heller*, 554 U.S. 570 (2008)........................................................... *passim*

*Dred Scott v. Sandford*, 60 U.S. 393 (1857) .............................................................................20

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)...................................................................................11

*English v. State*, 35 Tex. 473 (1871).........................................................................................32

*FCC v. Pacifica Found.*, 438 U.S. 726 (1978) ...........................................................................15

*Ginsberg v. New York*, 390 U.S. 629 (1968) .............................................................................15

*Gratz v. Bollinger*, 539 U.S. 244 (2003)...................................................................................38

*Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148 (D.C. Cir. 2004) ...............15

*Hodgson v. Minnesota*, 497 U.S. 417 (1990)..............................................................................46

*Johnson v. State*, 650 S.W.2d 414 (Tex. Crim. App. 1983), *overruled in part on other grounds*,
    *Boget v. State*, 74 S.W.3d 23 (Tex. Crim. App. 2002) ............................................................5

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005)..........................................................................44

*Lehr v. Robertson*, 463 U.S. 248 (1983) ...................................................................................16

*Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976)................................................44

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010).......................................4, 32, 33, 34, 36, 38

*New York v. Ferber*, 458 U.S. 747 (1982) ................................................................................15

*Nordyke v. King*, ___ F.3d___, No. 07-15763, 2011 WL 1632063 (9th Cir. May 2, 2011) ........37

*Nunn v. State*, 1 Ga. 243 (1846)................................................................................14, 26, 32

*Parham v. J.R.*, 442 U.S. 584 (1979)................................................................................46

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)................................................11, 22

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)....................................39

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) ................................................................37

*Prince v. Massachusetts*, 321 U.S. 158, 160-61 (1944)................................................................15

*Rex v. Knight*, 90 Eng. Rep. 330 (1686) ................................................................................22

*Richard v. Hinson*, 70 F.3d 415 (5th Cir. 1995) ................................................................33

*Roe v. Wade*, 410 U.S. 113 (1973)................................................................................37

*Roper v. Simmons*, 543 U.S 551, 568 (2005)................................................................18

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ................................................33

*Schall v. Martin*, 467 U.S. 253 (1984)................................................................................16

*Simpson v. State*, 13 Tenn. 356 (1833) ................................................................................30

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ................................................................28

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)................................................46

*State v. Chandler*, 5 La. Ann. 489 (1850)................................................................................32

*State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843)................................................................30

*State v. Reid*, 1 Ala. 612 (1840) ................................................................................27, 28, 32

*Taylor v. Johnson*, 257 F.3d 470 (5th Cir. 2003)................................................................33

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)................................................................35

*United States v. Anderson*, 559 F.3d 348 (5th Cir. 2009)................................................................8

*United States v. Bay*, No. 2:09-CR-83 TS, 2009 WL 3818382 (D. Utah, Nov. 13, 2009) .............8

*United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938) .........................................33

*United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003) ..................................................8

*United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah 2009) ................................8

*United States v. Everist*, 368 F.3d 517 (5th Cir. 2004) ..................................................36

*United States v. Grace*, 461 U.S. 171 (1983) .................................................................20

*United States v. Ligon*, No. 3:04-cr-00185-HDM,
    2010 WL 4237970 (D. Nev. Oct. 20, 2010) ...........................................................8

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ...........................................35

*United States v. Miller*, 307 U.S. 174 (1939) .........................................................10, 13

*United States v. Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ................................8

*United States v. Sanchez*, No. CR 09-1125-FRZ-GEE, 2009 WL 4898122
    (D. Ariz. Dec. 11, 2009) .......................................................................................8

*United States v. Scroggins*, 599 F.3d 433 (5th Cir. 2010) ..............................................8

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ..................................................8

*United States v. Stevens*, 130 S. Ct. 1577 (2010) .......................................................35

*United States v. Virginia*, 518 U.S. 515 (1996) ...........................................................39

*Waddell v. State*, 37 Tex. 354 (1872) ...........................................................................39

*Wright v. United States*, 302 U.S. 583 (1938) .............................................................20

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ................................33

## Statutes and Legislative Materials

U.S. CONST. art. I, § 8 ....................................................................................................10

U.S. CONST. amend. II ...................................................................................................18

U.S. CONST. amend. III ..................................................................................................20

10 U.S.C. § 505(a) .........................................................................................................17

18 U.S.C. § 922(b)(1) .......................................................................................................5

50 U.S.C. App'x §§ 453-54 ...............................................................................17

Tex. Civ. Prac. & Rem. Code § 129.001 (Vernon 2010) ...........................4, 15

Tex. Elec. Code 11.002 (Vernon 2010) ....................................................4, 41

Tex. Fam. Code § 2.101 (Vernon 2010) ...................................................4, 41

Tex. Fam. Code § 101.003 (Vernon 2010) ...............................................4, 16

Tex. Fam. Code § 151.001 (Vernon 2010) ...............................................4, 16

Tex. Gov't Code § 62.101 (Vernon 2010) ....................................................41

Tex. Gov't Code § 62.102 (Vernon 2010) ....................................................41

Tex. Gov't Code § 411.172 (Vernon 2010) ...............................................5, 42

Tex. Gov't Code § 411.174 (Vernon 2010) ...............................................5, 42

Tex. Gov't Code § 411.176 (Vernon 2010) ...................................................42

Tex. Gov't Code § 411.188 (Vernon 2010) ...................................................42

Tex. Penal Code § 8.07 (Vernon 2010) .............................................4, 18, 41

Tex. Penal Code § 12.21 (Vernon 2010) .........................................................6

Tex. Penal Code § 46.02 (Vernon 2010) ....................................................5, 6

Tex. Penal Code § 46.15 (Vernon 2010) .........................................................5

An Act for the Better Ordering and Governing Negroes and Other Slaves in this Province,
    and to Prevent the Inveigling or Carrying Away Slaves from Their Masters or Employers
    (Ga. 1765) in Acts Passed by the General Assembly of Georgia (1765) .....................30

An Act for the Better Security of the Inhabitants, By Obliging the Male White Persons
    to Carry Fire Arms To Places of Public Worship (Ga. 1770) in A Digest of the Laws
    of the State of Georgia (1800) ......................................................................25

An Act for the Protection and Security of the Sheep and Other Stock on
    Tarpaulin-Cove-Island, Otherwise Called Naushon-Islands, and on Nennemesset-Island;
    and Several Small Islands Contiguous, Situated in the County of Dukes'-County in
    Laws of the Commonwealth of Massachusetts (Mass. 1790) .....................................30

An Act Forbidding and Punishing Affrays (Va. 1786) in A Collection of All Such Acts of
    the General Assembly of Virginia (Augustine Davis ed., 1794) .............................30

An Act more effectually to provide for the National Defence by establishing an Uniform
    Militia throughout the United States, ch. 33, 1 Stat. 271 (1792) ...................................2, 11, 13

1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689).............................................................21

2 ANNALS OF CONGRESS (1834)........................................................................................................12

*Lowering the Voting Age to 18*, S. REP. NO. 92-26 (March 8, 1971) ...........................................17

Texas House of Representatives Committee Hearing Testimony for the Committee on Public
    Safety, 74th Legislature, held on Mar. 21, 1995 (on file with Texas State Legislature
    House Media Office).................................................................................................................43

Texas House of Representatives Floor Debate, 74th Legislature, held on May 1, 1995
    (on file with Texas State Legislature House Media Office) ....................................................40

## **Other**

1 DICTIONARY OF THE ENGLISH LANGUAGE 161 (4th ed.) (reprinted 1978) ..................................19

1 W. HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716) ................................23, 28, 29

2 COLLECTED WORKS OF JAMES WILSON (K. Hall & M. Hall eds., 2007) ....................................23

3 BIRD WILSON, THE WORKS OF THE HONOURABLE JAMES WLSON 79 (1804) ............................29

*A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788),
    *reprinted in* Les Adams, THE SECOND AMENDMENT PRIMER (1996) ......................................10

BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES
    (Washington, D.C., 1872), *available at*
    http://www.archive.org/details/inmemoriambenjam00wats ...................................................24

BLACK'S LAW DICTIONARY (9th ed. 2009) ...................................................................................15

BLACKSTONE COMMENTARIES ................................................................... 14, 21, 22, 28

BLACKSTONE COMMENTARIES (Christian ed., 1794) ...................................................................22

BLACKSTONE COMMENTARIES (St. George Tucker ed., 1803) ....................................................24

Brief of the State of Texas et al. as *Amici Curiae* in Support of Petitioners,
    *McDonald v. City of Chicago*, No. 08-1521 (U.S. Nov. 2009) ...........................................1, 21

Brief of the State of Texas et al. as *Amici Curiae* in Support of Respondent,
    *District of Columbia v. Heller*, No. 07-290 (U.S. Feb. 2008) ........................................1, 3, 11

Brief of United States, *District of Columbia v. Heller,* No. 07-290 (U.S. Jan. 2008) ...................35

C. Kevin  Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y 695 (2009)........................................................................................................................28

CHARLES F. WELLFORD, JOHN V. PEPPER & CAROL V. PETRIE (eds.), FIREARMS AND VIOLENCE: A CRITICAL REVIEW 6 (2004) ..........................................................................................41, 43

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY (1822)........................................................................................................30

DAVID HEMENWAY, PRIVATE GUNS, PUBLIC HEALTH:  A DRAMATIC NEW PLAN FOR ENDING AMERICA'S EPIDEMIC OF GUN VIOLENCE (2004) ....................................................................40

DAVID MCCULLOUGH, JOHN ADAMS (2001)................................................................................24

Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204 (1983-84) ................................................................................................13

FBI, *Crime in the United States 2009*, Table 38:  Arrests by Age, *available at* http://www2.fbi.gov/ucr/cius2009/data/table_38.html#overview ...........................................46

GARY KLECK & DON B. KATES, ARMED (2001) ..........................................................................43

GEORGE C. NEUMANN, THE HISTORY OF THE WEAPONS OF THE AMERICAN REVOLUTION (1967)................................................................................................................................24

H. Sterling Burnett, National Center for Policy Analysis, *Texas Concealed Handgun Carriers:  Law-Abiding Public Benefactors* 1 (2000), *available at* http://www.ncpa.org/pub/ba324 ...................................................................................43

HOMER H. CLARK, THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES (2d ed. 1988) .....15

J. BISHOP, COMMENTARIES ON WRITTEN LAWS AND THEIR INTERPRETATION (1882) ....................9

JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW (1826) ........................................................16

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 MASTERPIECES OF ELOQUENCE 2569 (Hazeltine et al. eds. 1905) ............................................................................................24

JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS (1994) ...........................................................25

*Legality of the London Military Foot-Association* (1780), *reprinted in* WILLIAM BLIZARD, DESULTORY REFLECTIONS ON POLICE 59 (1785) ..............................................................22, 25

*Letter to Destutt de Tracy* (Jan. 26, 1811), *in* THE PORTABLE THOMAS JEFFERSON 520 (M. Peterson ed. 1975) ........................................................................................10

Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 U.C.L.A. L. REV. 1343 (2009) .......................................................................31

NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ...............10, 19, 24

PEREGRINE BINGHAM, THE LAW OF INFANCY & COVERTURE (1824) ...........................................14

Philip J. Cook, Jens Ludwig, & Adam M. Samaha, *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 U.C.L.A. L. REV. 1041 (2009)............40, 43

RICHARD FROTHINGHAM, LIFE AND TIMES OF JOSEPH WARREN (Boston: Little, Brown, & Co., 1865) ....................................................................................................25

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review,* 28 AM. J. PREV. MED. 40 (2005) .......................................................................40

Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 BAYLOR L. REV. 629 (1989)....................................................39

T. SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1796)THOMAS COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS (1868) ...........................................19

THOMAS JEFFERSON, WRITINGS (letter of August 19, 1785) (Merrill D. Peterson ed., 1984) .......25

THOMAS COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS 29 (1868) .............................17

THOMAS MCINTYRE COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA (1880) .............................................................................13

Tr. of Oral Argument, *District of Columbia v. Heller,* No. 07-290 (U.S. Mar. 18, 2008) ............8

*Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON (John C. Fitzpatrick, ed. 1938) ..............................12

U.S. Census Bureau, *Monthly Postcensal Resident Population, by single year of age, sex, race, and Hispanic origin*, July 1, 2009 data, *available for download at* http://www.census.gov/popest/national/asrh/2009-nat-res.html..............................................46

U.S. Dep't of Justice, Bureau of Justice Statistics Special Report, *Weapon Use and Violent Crime* (Sept. 2003), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/wuvc01.pdf .........44

WILLIAM W. HENING, THE NEW VIRGINIA JUSTICE, COMPRISING THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE, IN THE COMMONWEALTH OF VIRGINIA (2d ed. 1810) .................29

## INTRODUCTION

Not long ago the State of Texas believed that "the Second Amendment right to keep and bear arms is a critical liberty interest" and that "an individual right to keep and bear arms [is] an essential component of the natural right of self-preservation."  Brief of the State of Texas et al. as *Amici Curiae* in Support of Petitioners at 1, 5-6, *McDonald v. City of Chicago*, No. 08-1521 (U.S. Nov. 2009) (Tex. *McDonald* Br.).  In particular, the State believed that the Second Amendment "protects an individual right to keep and bear *any* weapons that are in common use by Americans," *id.* at 25 (quotation marks omitted, emphasis in original), including handguns, which the State recognized as "the quintessential self-defense weapon."  *Id.* at 9.  Indeed, in arguments to the Supreme Court of the United States, Texas once affirmed that the Second Amendment guarantees an individual right "*to wear, bear, or carry arms*," and that this right belongs not to a select few, but to "the people," in order to "ensure a ready Militia consisting of each and every able-bodied male between the *ages of eighteen to forty-five*."  Brief of the State of Texas et al. as *Amici Curiae* in Support of Respondent at 11, 14, *District of Columbia v. Heller*, No. 07-290 (U.S. Feb. 2008) (Tex. *Heller* Br.) (emphasis added, internal quotation marks omitted).

But Texas' former ringing endorsement of the rights of "the people" to "wear, bear and carry arms" now rings hollow in the ears of law-abiding Texas adults between the ages of 18 and 21, because Texas prohibits all members of that age cohort who have not served in the military from carrying a handgun to defend themselves outside of their homes and automobiles.

In this suit, Plaintiff—the National Rifle Association, which sues on behalf of its 18-to-20-year-old, law-abiding adult members, including Rebekah Jennings, Brennan Harmon, and

Andrew Payne—challenges this infringement of its members' rights.[1]  We maintain that the case can be decided without further proceedings as a matter of law.  To resolve this case, the Court need only answer three questions:

    (1)    Does the Second Amendment apply to all law-abiding adults, or does it leave some law-abiding adults without protection simply on account of their age?

    (2)    Is the Second Amendment right to bear arms limited to one's home and automobile?

    (3)    Following *Heller*, what is the appropriate analytical framework for review of restrictions on Second Amendment rights?

As to the first question, the Second Amendment protects all law-abiding adults, including 18-to-20-year-olds.  Indeed, just months after ratification of the Second Amendment, Congress enacted the Militia Act of 1792, which required all able-bodied men to enroll in the militia and to arm themselves upon turning 18.  *See* An Act more effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States, ch. 33, 1 Stat. 271 (1792) (hereinafter "Militia Act of 1792").  This Act reflected the widespread understanding that citizens reached the age for militia membership by 18.  Finding 18-to-20-year-olds to have anything less than full Second Amendment rights cannot be squared with this understanding, for "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms" was the *very "reason that right [to keep and bear arms] was codified in a written Constitution*."  *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008) (emphasis added).  The Supreme Court held that this understanding by those who wrote and ratified the Second Amendment *resolves* the constitutional issue, *regardless* of future generations' actions, because

---

[1]  Rebekah Jennings, Brennan Harmon, and Andrew Payne have filed a motion to join this case as party plaintiffs, which remains pending.  Because they are members of Plaintiff NRA, facts about them are relevant regardless of their party status.  *See* Jennings Decl. ¶ 3, App. 9; Harmon Decl. ¶ 3, App. 4, Payne Decl. ¶ 2, App. 15.  For ease of reference, the term "Plaintiffs" in this brief includes Ms. Jennings, Ms. Harmon, and Mr. Payne.

"[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 634-35.

Further, at 18 years of age, law-abiding citizens in this country are considered adults both by the State of Texas and with respect to the exercise of fundamental rights enumerated in the Constitution.  Indeed, as noted above, Texas advised the Supreme Court in *Heller* that the militia in the Second Amendment included "each and every able-bodied male between the ages of eighteen to forty-five," indicating that Texas counted those aged 18 to 20 among " 'the people' " who were entitled to these rights.  Tex. *Heller* Br. at 11, 14.  Yet, presumably because some 18-to-20-year-olds commit handgun crimes, Texas bans *all* 18-to-20-year-olds other than members of the armed forces and veterans from carrying handguns outside of their homes or automobiles.  This prohibition sweeps in heads of households, firefighters, single women living alone in dangerous neighborhoods, hunters with years of firearms experience, decorated competitive shooters, and thousands of ordinary, law-abiding citizens who desire to exercise the fundamental right of self-defense that lies at the very core of the Second Amendment.

As to the second question, the Framers of the Second Amendment did not conceive of the right to bear arms as limited to narrowly circumscribed locations.  Indeed, "at the time of the Founding, as now, to 'bear' [simply] meant to 'carry,' " *Heller*, 554 U.S. at 584, and the Constitution contains no textual warrant for interpreting the right in a crabbed manner.  Although history indicates that there may be some limited locations where the right to bear arms does not apply with full force, that history does not support the proposition that an entire class of law-abiding adults can be stripped of the right to bear arms in all public spaces.

With respect to the third and final question, *Heller* sets forth the standard for reviewing this (and all) Second Amendment challenges: the Court is to employ a textual and historical

3

analysis to determine whether the particular firearm restriction in question contravenes the constitutional right as originally understood.  If so, the law cannot stand.  Despite *Heller*'s clarity on the proper analytical framework for Second Amendment cases, the lower federal courts have applied a wide variety of tests and frameworks to post-*Heller* challenges.  Most courts have adopted a multi-tier scrutiny approach and have held that some form of intermediate scrutiny applies.  Such an approach cannot be squared with *Heller* and *McDonald*, but even if it could, protection of this fundamental, enumerated right demands strict scrutiny.  The Second Amendment is not to "be singled out for special—and specially unfavorable—treatment."  *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3043 (2010).  We hasten to add, however, that the statute at issue here cannot withstand any level of heightened scrutiny.

In short, the answers to these three questions are clear and compel the result that the challenged laws are unconstitutional under the Second and Fourteenth Amendments.

## BACKGROUND

I.   **REGULATORY BACKGROUND**

Texans aged 18-to-20 are legal adults.  *See* TEX. CIV. PRAC. & REM. CODE § 129.001 (Vernon 2010) ("The age of majority in this state is 18 years.").  Upon turning 18, Texans, *inter alia*, are no longer due the care, control, and protection of their parents, *see* TEX. FAM. CODE §§ 151.001(a)(2), 101.003 (Vernon 2010), are free to marry without parental consent, *see id.* § 2.101 (Vernon 2010), are eligible to vote, *see* TEX. ELEC. CODE 11.002(a) (Vernon 2010), and are subject to the death penalty, TEX. PENAL CODE § 8.07(c) (Vernon 2010).  Yet Texas generally prohibits law-abiding, 18-to-20 year old adults from carrying a handgun for self-defense outside of their homes or automobiles.  Pursuant to the State's Penal Code, "A person commits an offense if the person intentionally, knowingly, or recklessly carries on or about his or her person a handgun … if the person is not: (1) on the person's own premises or premises under the per-

son's control; or (2) inside of or directly en route to a motor vehicle that is owned by the person

or under the person's control." TEX. PENAL CODE § 46.02(a) (Vernon 2010).  While there are

exceptions for individuals with certain positions (*e.g.*, peace officers, federal judges, *see id.* §

46.15(a) (Vernon 2010)), and for individuals engaged in certain activities (*e.g.*, lawful hunting,

official military duties, *see id.* § 46.15(b)), these exceptions provide no relief to law-abiding

Texans who simply desire to carry a handgun for self-protection.  *Cf. Johnson v. State*, 650

S.W.2d 414, 416 (Tex. Crim. App. 1983), *overruled in part on other grounds*, *Boget v. State*, 74

S.W.3d 23 (Tex. Crim. App. 2002) ("to allow a defense of necessity whenever anyone 'felt he

was in a "high crime" area' … would violate the intent of Sec. 46.02").

There is, however, one exception that generally does operate to permit most adult, law-

abiding Texans to carry a handgun for self-defense:  the prohibition does not apply when a per-

son "is carrying a concealed handgun *and* a valid license issued under Subchapter H, Chapter

411, Government Code, to carry a concealed handgun of the same category as the handgun the

person is carrying." TEX. PENAL CODE § 46.15(b)(6) (Vernon 2010) (emphasis added).  But to

obtain a Texas Concealed Handgun License (CHL) a person must be "at least 21 years of age"

unless he or she is a member of or honorably discharged from the military (this latter class of

persons can obtain a CHL upon turning 18). TEX. GOV'T CODE §§ 411.172(a)(2), (g) (Vernon

2010).[2]  Indeed, because applicants for a CHL must sign and submit an affidavit stating that they

"fulfill[] all the eligibility requirements" for obtaining one, *id.* § 411.174(a)(8)(B), Texas law

prohibits 18-to-20 year old civilians from even *applying* for a concealed handgun license.

---

[2] The additional requirement that to be eligible for a CHL a person must be "fully quali-
fied under applicable federal … law to purchase a handgun, TEX. GOV'T CODE § 411.172(a)(9)
(Vernon 2010), also acts as a bar on 18-to-20-year-olds obtaining a CHL because federal law
prohibits licensed firearms dealers from selling handguns to persons under 21 years of age, *see*
18 U.S.C. § 922(b)(1).

The net effect of these laws is that an 18-to-20-year-old civilian in Texas who carries a handgun for self-protection outside of his or her home or car is guilty of a crime punishable by imprisonment for up to a year and a fine of up to $4,000.  *See* TEX. PENAL CODE §§ 46.02(b) & 12.21 (Vernon 2010).

## II.   PLAINTIFFS' BACKGROUND

Rebekah Jennings is a twenty-year-old resident of Boerne, Texas who attends college in San Antonio.  Jennings Decl. ¶ 2, App. 9.  She is a decorated competitive pistol shooter, having been a member of the U.S. Olympic Development Team and the Texas State Rifle Association's Junior National Team.  *Id.* ¶ 4, App. 9.  Indeed, she holds several national records for competitive pistol shooting.  *Id.*  She has logged thousands of hours practicing the use of handguns, *id.* ¶ 5, App. 10, and is thus much better versed than most adults over the age of 21 in the safe and proficient handling of handguns and handgun ammunition.  Nonetheless, because Texas law prohibits her from doing so, she does not carry a handgun for self-defense outside of her home or automobile.  *Id.* ¶ 9, App. 10.  Ms. Jennings desires to carry a handgun for self-defense and other lawful purposes.  For example, if lawfully permitted to do so she would carry a handgun when attending open-air art shows held on Friday evenings in downtown San Antonio.  *Id.* ¶ 10, App. 10-11.

Brennan Harmon is a nineteen-year-old from Dallas, Texas who attends college in San Antonio, Texas.  *See* Harmon Decl. ¶ 2, App. 4.  Ms. Harmon's family owns several firearms and her father has instructed her in their proper and safe handling.  *Id.* ¶¶ 4-5, App. 4-5.  Ms. Harmon currently does not carry a handgun for self-defense outside of her home or automobile because Texas law prohibits it.  *Id.* ¶ 8, App. 5.   If lawfully permitted to do so, Ms. Harmon would carry

a handgun for self-defense and other lawful purposes, for example when visiting friends at night in and around downtown Dallas.  *Id.* ¶¶ 8-9, App. 5-6.

Andrew Payne is an eighteen-year-old resident of Lubbock, Texas.  Payne Decl. ¶ 1, App. 15.  Mr. Payne and his father visit shooting ranges for recreation and to gain proficiency in the effective and safe use of firearms, including handguns.  *Id.* ¶ 3, App. 15.  Because of Texas law, Mr. Payne does not carry a handgun for self-defense outside of his home or automobile.  *Id.* ¶ 7, App. 16. He would carry a handgun for self-defense if lawfully permitted to do so.  For example, he would carry a handgun when patronizing a Wal-Mart store in an area of town where he would feel safer if armed.  *Id*. ¶¶ 7-8, App. 16.

The National Rifle Association is a membership organization committed to protecting and defending the fundamental right to keep and bear arms, as well as promoting the safe and responsible use of firearms for self-defense and other lawful purposes.  Marcario Decl. ¶ 3, App. 1-2.  Hundreds of the NRA's members in Texas are 18-to-20 years old, or will enter that age bracket during the pendency of this litigation.  *See* Marcario Decl. ¶ 6, App. 2.  But for Texas law prohibiting it, some of these 18-to-20 year old NRA members, including Ms. Jennings, Ms. Harmon, and Mr. Payne, would be eligible to obtain a CHL and would carry a handgun for self-defense outside of the home or automobile.

## ARGUMENT

I.    **THIS COURT SHOULD EMPLOY THE ANALYSIS APPLIED BY THE SUPREME COURT IN *HELLER*, WHICH CONSISTS OF TEXTUAL ANALYSIS AND HISTORICAL INQUIRY AT-TUNED TO THE PARTICULAR FIREARMS REGULATION BEING CHALLENGED.**

In *Heller*, the Supreme Court declined invitations from the petitioner, the Solicitor General of the United States, and the dissenting Justices to apply to the Second Amendment the elaborate tiers of scrutiny analytical framework developed under the First Amendment and the

7

Equal Protection Clause. *See* 554 U.S. at 628-29, 634; *id*. at 704-05 (Breyer, J., dissenting). As the Chief Justice, a member of the *Heller* majority, explained during oral argument, any inquiry into levels of scrutiny would have been both atextual and unhelpful. *See* Tr. of Oral Argument at 44, *District of Columbia v. Heller,* No. 07-290 (U.S. Mar. 18, 2008). The Court instead engaged in a textual and historical inquiry attuned to the particular firearms regulation at issue. *See* 554 U.S. at 628-29. Despite these unambiguous signals from the nation's highest court, most lower courts since *Heller* have nonetheless imported the levels-of-scrutiny framework and applied heightened standards ranging from intermediate scrutiny to strict scrutiny.[3]

The Fifth Circuit has not resolved the question of the proper standard of review for a Second Amendment challenge, at least with respect to laws that involve the rights of law-abiding adults to keep and bear arms. *See United States v. Anderson*, 559 F.3d 348, 352 & n.6 (5th Cir. 2009) (following *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003), to reject challenge to felon-in-possession law, citing *Heller*'s statement that it should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons"); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (same); *Darrington*, 351 F.3d at 635 (holding that felons are "exclude[d] … as a class from the Second Amendment's protection"). Thus, no expedition into what one court has called the " 'levels of scrutiny' quagmire" is required here. *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (*en banc*). This Court can, and should, decide this case utilizing the methods of textual analysis and historical inquiry employed by the Supreme

---

[3] *Compare, e.g., United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009) (applying strict scrutiny), *United States v. Ligon*, No. 3:04-cr-00185-HDM, 2010 WL 4237970, at *6 (D. Nev. Oct. 20, 2010) (same); *United States v. Sanchez*, No. CR 09-1125-FRZ-GEE, 2009 WL 4898122, at *3 (D. Ariz. Dec. 11, 2009) (same); and *United States v. Bay*, No. 2:09-CR-83 TS, 2009 WL 3818382, at *2 (D. Utah, Nov. 13, 2009) (same); *with United States v. Miller*, 604 F. Supp. 2d 1162, 1171 (W.D. Tenn. 2009) (applying intermediate scrutiny on theory that Second Amendment rights are not fundamental).

Court in *Heller*.  As we demonstrate below, such an analysis demonstrates that Texas' prohibition on 18-to-20-year-olds carrying handguns outside of their homes or automobiles unconstitutionally strikes at the core of Plaintiffs' Second Amendment right to armed self-defense.

II.    **THE SECOND AMENDMENT PRESERVES THE FUNDAMENTAL RIGHTS OF ALL LAW-ABIDING ADULTS, INCLUDING THOSE BETWEEN THE AGES OF 18 AND 21.**

The Second Amendment provides that "the right of the people to keep and bear Arms shall not be infringed."  In *Heller*, the Supreme Court engaged in a textual and historical analysis to determine that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation."  554 U.S. at 592 (emphasis added).  The same analytical tools demonstrate that this guarantee includes law-abiding adults over the age of 18.

A.    **Text and History:  The Second Amendment's Prefatory Clause**

The preface to the amendment —"A well regulated Militia, being necessary to the security of a free State,"  U.S. CONST. amend. II—"announces the purpose for which the right was codified:  to prevent elimination of the militia."  *Heller*, 554 U.S. at 599.  In other words, "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right … was codified in a written Constitution."  *Id*.  To be sure, the Second Amendment's prefatory clause cannot be read to "limit or expand the scope of the operative clause," but "[l]ogic demands that there be a link between the stated purpose and the command."  *Id*. at 577, 578.  And given the Second Amendment's stated purpose, logic demands that its protections extend *at least* to those whom the Framers understood to make up the militia, for it would make no sense to codify a constitutional right to bear arms for the purpose of ensuring a militia that did not extend protection to the militia itself.  *See id.* at 580 ("the 'militia' in colonial America consisted of a *subset* of 'the people' ") (emphasis added); *cf. id.* at 578 (" 'It is nothing unusual in acts for the enacting part to go *beyond* the preamble ….' ") (quoting J. BISHOP, COM-

9

MENTARIES ON WRITTEN LAWS AND THEIR INTERPRETATION § 51, at 49 (1882)) (emphasis added, alterations omitted).  Indeed, a contrary interpretation would destroy the "perfect[]" fit the Supreme Court found between the Second Amendment's preface and operative clause.  *Id*. at 598.

"[T]he conception of the militia at the time of the Second Amendment's ratification was the body of *all citizens capable of military service*, who would bring the sorts of lawful weapons that they possessed at home to militia duty."  *Heller*, 554 U.S. at 627 (emphasis added).  *See also id*. at 595 (militia comprised all males " 'capable of acting in concert for the common defense.' ") (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("The militia of a country are the able bodied men organized into companies, regiments and brigades ….") and *Letter to Destutt de Tracy* (Jan. 26, 1811), *in* THE PORTABLE THOMAS JEFFERSON 520, 524 (M. Peterson ed. 1975) ("the militia of the State, that is to say, of every man in it able to bear arms") (both quoted in *Heller*, 554 U.S. at 595-96).  Members of the militia, in other words, were presumptively capable of keeping and bearing arms and hence *entitled* to do so.  *See A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788), *reprinted in* Les Adams, THE SECOND AMENDMENT PRIMER 121 (1996) ("The militia of these free commonwealths, entitled and accustomed to their arms, when compared to any possible army must be tremendous and irresistible.").

There is no doubt that 18-to-20-year-olds were understood to be part of the militia—and hence to have the capacity, right, and duty to keep and bear arms—at the time the Second Amendment was framed and ratified.  This is readily apparent from Congress's initial effort to "provide for organizing, arming, and disciplining, the militia."  U.S. CONST. art. I, § 8.  On May 8, 1792, months after ratification of the Second Amendment, Congress exercised this grant of power in the Militia Act of 1792, which provided, among other things, that "each and every free

able-bodied white male citizen of the respective states, resident therein, who is or *shall be of the age of eighteen years*, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia." 1 Stat. 271 (emphasis added). While Congress was under no obligation to organize the *entire* militia (or indeed to organize the militia at all), its constitutional regulatory authority extended *only* to militia members – that is, to those understood to have both the right and the duty to bear arms. *See Heller*, 554 at 596, 627.

As a contemporaneous act of Congress, the Militia Act of 1792 is strong evidence that the reason for codifying the right to keep and bear arms—to wit, preserving the militia—was understood to require that Second Amendment rights fully vest by age 18. "[M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment." *Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570. *See also Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) ("this Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given the Constitution's provisions") (quotation marks and brackets omitted).

Prior to the filing of this lawsuit, this was also the position formally taken by the State of Texas. In its brief urging the Supreme Court to adopt a robust interpretation of the Second Amendment in *Heller*, Texas argued that the right to bear arms historically belonged to " 'the people' " which, it argued, included those "able-bodied" citizens "between the ages of *eighteen* to forty-five" who were eligible for militia service. Tex. *Heller* Br. at 11, 14 (emphasis added).

The legislative history of the Militia Act of 1792 lends further support for marking 18 as the age at which Second Amendment rights fully vest.  In 1790, Secretary of War Henry Knox submitted to Congress a militia plan embodying the principle that "all men of the legal military age should be armed," and providing that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen."  2 ANNALS OF CONGRESS 2145-46.  Indeed, Representative Jackson argued "that from eighteen to twenty-one was found to be the *best* age to make soldiers of."  *Id.* at 1860 (emphasis added).   Eighteen is also the age that George Washington—who was not only our first President but also President of the Constitutional Convention—recommended for militia enrollment. In an enclosure to a 1783 letter to Alexander Hamilton (in his capacity as chairman of the Committee of the Continental Congress on the Peace Establishment), General Washington wrote that, "[i]t may be laid down as a primary position, and the basis of our system, that every Citizen who enjoys the protection of a free Government, owes … his personal service to the defence of it, and consequently that the Citizens of America … from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at a Short Notice on any very interesting Emergency."  *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick ed., 1938).

Looking to the States, militia laws passed shortly before the Second Amendment was ratified provided for militia enrollment no later than 18.[4]  There was thus a consensus that, by age 18, individuals were able to, and hence entitled to, bear arms.  This early State practice is consis-

---

[4]  States passing laws with a minimum age of no more than 18:  Connecticut, Delaware, Georgia, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Vermont, Virginia.  *See* Early State Militia Laws, App. 30.

tent with the practice of the colonies.  *See* Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 215 n.46 (1983-84).

Furthermore, militia membership presupposed firearm possession, because "when called for service these men were expected to appear bearing arms supplied by *themselves*."  *Miller*, 307 U.S. at 179 (emphasis added) (quoted in *Heller*, 554 U.S. at 624).  This is reflected in the Militia Act of 1792, which required each enrollee, regardless of age, "within six months [of enrollment, to] provide himself with a good musket or firelock."  1 Stat. 271.  Several state laws contained similar provisions.[5]  These requirements provide strong evidence that Second Amendment rights vest at 18:  at that age, individuals were not only entrusted with using firearms in connection with organized militia activities, they were also expected to keep and bear those arms as private citizens. The founding-era understanding that 18-year-olds were part of the militia was not merely a legislative judgment about their physical suitability for service, it was a recognition of their *legal status.*

## B.      Text and History: The Second Amendment's Operative Clause

*"Right of the People."*  As used in the Bill of Rights, "the people" have always been understood in a broad sense.  Indeed, "in all the enumerations and guaranties of rights the whole people are intended."  THOMAS MCINTYRE COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267-68 (1880).  As the Supreme Court has explained, "[i]ts uses suggest that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that communi-

---

[5] *See, e.g.*, militia laws of Connecticut, New York, Rhode Island, and Vermont, App. 30, 35-38.

ty." *Heller*, 554 U.S. at 580 (quotation marks and brackets omitted).  The use of "the people,"
thus indicates that "the Second Amendment right is exercised individually and belongs to all
Americans."  *Id.* at 581.  In *Heller*, the Supreme Court quoted with approval the words of the
Supreme Court of Georgia:  "The right of the whole people, old and young, men, women and
boys, and not militia only, to keep and bear arms of every description, and not such merely as are
used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree."
*Nunn v. State*, 1 Ga. 243, 251 (1846) (quoted in *Heller*, 554 U.S. at 612-13) (emphasis omitted).

   ***"To Keep and Bear Arms."***  The founding-era militia practices we have surveyed in
connection with the prefatory clause unequivocally demonstrate that 18-to-20-year-olds are
among those possessing the right  "to Keep and Bear Arms" guaranteed by the Second Amend-
ment.  This conclusion is unaffected by the recognition that the common-law age of majority of
21 prevailed in the states when the Second Amendment was ratified.  As the militia laws show,
when the Bill of Rights was adopted an individual was not deemed to lack all legal rights and
obligations just because he was considered a minor.  At common law, minimum age require-
ments were "different for different purposes."  1 BLACKSTONE COMMENTARIES *463.  At age 14,
for example, individuals were deemed to have reached the age of discretion and could be "capi-
tally punished for any capital offense."  *Id.* at *463-64; *see also* PEREGRINE BINGHAM, THE LAW
OF INFANCY & COVERTURE 114 (1824).  The fact that an individual had not attained the age of
majority did not control the individual's capacity—or his duty—to exercise a particular right.  In
modern times as well, the Supreme Court has repeatedly vindicated the constitutional rights of
individuals under 21.  In *Carey v. Population Services International*, 431 U.S. 678 (1977), for
example, the Supreme Court struck down a New York law making it a crime "for anyone other
than a licensed pharmacist to distribute contraceptives to persons 16 or over," *id.* at 681.  Ana-

14

lyzing this restriction as a "prohibition of the distribution of nonmedical contraceptives to adults except through licensed pharmacists," the Court held that it infringed the right of women to make "individual decisions in matters of childbearing." *Id*. at 687-88.   The present case, unlike *Carey*, involves an enumerated constitutional right, and immediately after that right was enshrined in the Constitution, 18-to-20-year-olds were not only permitted but expressly *required* by federal law to keep and bear arms.

In any event, while 18-to-20-year-olds enjoyed full Second Amendment rights and responsibilities in the Founding Era regardless of their minority status, today's 18-to-20-year-olds *are no longer considered minors* by the State of Texas or, indeed, by the vast majority of States in the Union.[6]   In other words, any disabilities which may be imposed on minors' ability to keep and bear arms have no bearing on what disabilities may properly be placed on 18-to-20-year-old *adults*. *Cf. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1155 (D.C. Cir. 2004) (Roberts, J.) ("the concern that the state not treat *adults* like children surely does not prevent it from treating *children* like children") (emphasis added).   In sustaining laws aimed at children *under 18*, the Supreme Court has made clear that the constitutional rights of children are not necessarily coextensive with those of adults.[7]   This doctrine rests in large part on the com-

---

[6] *See* TEX. CIV. PRAC. & REM. CODE § 129.001 (Vernon 2010) ("The age of majority in this state is 18 years."); HOMER H. CLARK, THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 8.1 (2d ed. 1988) ("during the 1970's all except five states reduced the age of majority to eighteen"); BLACK'S LAW DICTIONARY 70 (9th ed. 2009) ("age of majority" is "[t]he age, usu. defined by statute as 18 years, at which a person attains full legal rights, esp. civil and political rights such as the right to vote").

[7] *See New York v. Ferber*, 458 U.S. 747, 749 (1982) (upholding statute "which prohibit[ed] persons from knowingly promoting sexual performances by children under the age of 16"); *FCC v. Pacifica Found.*, 438 U.S. 726, 749 (1978) (upholding broadcast regulation because "broadcasting is uniquely accessible to children, even those too young to read"); *Ginsberg v. New York*, 390 U.S. 629, 631 (1968) (upholding "New York criminal obscenity statute which prohibit[ed] the sale to minors under 17 years of age of material defined to be obscene on the basis of its appeal to them whether or not it would be obscene to adults"); *Prince v. Massachusetts*,

plementary rights and responsibilities parents have with respect to their minor children.[8]  This is in keeping with the traditional common-law rule that "[t]he rights of parents result from their duties.  As they are bound to maintain and educate their children, the law has given them a right to such authority."  JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW 203 (1826); *see also Lehr v. Robertson*, 463 U.S. 248, 257 (1983) ("the rights of the parents are a counterpart of the responsibilities they have assumed").  This reasoning simply does not apply to 18-to-20-year-olds who are legal adults and no longer subject to parental protection and control.

Finally, it would be particularly perverse to hold that the State can treat 18-to-20-year-old adults as children in the context of the Second Amendment.  "[T]he inherent right of self-defense [is] central to the Second Amendment right," *Heller*, 554 U.S. at 628, and although the details vary from state to state, because 18 is the age at which the states (including Texas) have overwhelmingly established as the age of majority, that is also generally the age at which individuals in our society may establish their own households and shoulder the responsibility for protecting themselves, their families, and their property.[9]  Law-abiding citizens whom society vests with

---

321 U.S. 158, 160-61 (1944) (upholding law providing that "[n]o boy under twelve and no girl under eighteen shall sell, expose or offer for sale any newspapers, magazines, periodicals or any other articles of merchandise of any description, or exercise … any other trade, in any street or public place").

[8] *See, e.g., Bellotti v. Baird*, 443 U.S. 622, 637 (1979) (plurality) ("the guiding role of parents in the upbringing of their children justifies limitations on the freedom of minors"); *Schall v. Martin*, 467 U.S. 253, 265 (1984) ("Children, by definition, are not assumed to have the capacity to take care of themselves.  They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae*.  In this respect, the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's *parens patriae* interest in preserving and promoting the welfare of the child.") (citations and quotation marks omitted).

[9] *See, e.g.,* TEX. FAM. CODE § 151.001(a) (Vernon 2010) ("parent of a child" has "rights and duties" including "the right … to designate the residence of the child"; "the duty of care, control, protection, and reasonable discipline of the child"; and "the right to consent to the child's marriage"); *id.* § 101.003(a) (defining "child or minor" as "a person under 18 years of age

such responsibilities must be afforded the right to exercise constitutional means of performing them effectively and safely, including the right to keep and bear arms.

The Twenty-Sixth Amendment grants the right to vote to 18-year-old citizens, and in a republican form of government "[a]s a practical fact, the sovereignty is vested in those persons who by the constitution of the State are allowed to exercise the elective franchise." Thomas Cooley, A Treatise on Constitutional Limitations 29 (1868). The right to vote is thus a marker of full membership in the political community, and extending the right to vote to a group recognizes that its members possess "the intelligence and the freedom of will essential to the proper exercise of the right." *Id.* Indeed, the Twenty-Sixth Amendment was proposed and ratified against the backdrop of a growing recognition that by the age of 18 "citizens … bear all or most of an adult citizen's responsibilities." *Lowering the Voting Age to 18*, S. Rep. No. 92-26, at 6 (March 8, 1971). Of particular importance was the liability of 18-to-20-year-olds to be conscripted to bear arms, fight, and potentially die for their country in the Vietnam War. *See id.* ("Nearly 1 million [18-to-20-year-olds] are serving their country in the Armed Forces. And tens of thousands of young people have paid the supreme sacrifice in the Indochina War over the past five years."). Given that they "willingly shouldered" such grave responsibilities, it was "wrong to deprive [18-to-20-year-old] citizens of the vote" and thus deprive them of "full participation in our political system." *Id.* Today, of course, 18 remains the age at which young men become liable for military service, 50 U.S.C. App'x §§ 453-54, and it is also the age at which individuals may enlist in the armed forces without parental consent, 10 U.S.C. § 505(a).

While the Twenty-Sixth Amendment extends our Nation's full political rights to 18-to-20-year-olds, the Eighth Amendment subjects them to liability for the death penalty, our Na-

---

who is not and has not been married or who has not had the disabilities of minority removed for general purposes").

tion's most profound form of criminal punishment, and one reserved for those whose "extreme culpability makes them the most deserving of execution."  *Roper v. Simmons*, 543 U.S 551, 568 (2005) (quotation marks omitted).  Consistent with this understanding, death penalty eligibility in Texas begins at age 18.  TEX. PENAL CODE § 8.07(c) (Vernon 2010).

In holding that 18-year-olds may constitutionally be subject to capital punishment, the Supreme Court expressly recognized the connection between that age and the onset of adulthood.  *See Roper*, 543 U.S at 574 ("The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.  It is, we conclude, the age at which the line for death eligibility ought to rest.").  And in holding that individuals younger than 18 may *not* be punished by death, the Court emphasized "differences between juveniles under 18 and *adults*."  *Id*. at 569 (emphasis added).  While those differences do not suddenly "disappear when an individual turns 18," by permitting 18-year-olds to be subject to the death penalty the Court recognized that 18-year-olds are sufficiently mature that "their irresponsible conduct" may be "as morally reprehensible as that of" older adults.  *Id*. at 570, 574 (quotation marks omitted).

## III.    TEXAS' LAW INFRINGES PLAINTIFFS' RIGHT TO BEAR ARMS.

In *Heller*, the Supreme Court applied textual and historical analysis to determine that a municipal ban on handgun possession *inside* the home could not be reconciled with the Second Amendment.   The same analytical tools demonstrate that Texas' ban on 18-to-20-year-olds carrying handguns *outside* their homes (or automobiles) likewise strikes at the heart of Plaintiffs' Second Amendment right to armed "self-defense."  *Heller*, 554 U.S. at 599.

### A.    The Right to Carry Firearms is not Limited to Narrowly Circumscribed Locations.

The Second Amendment provides that "the right of the people to keep *and bear* Arms shall not be infringed."  (Emphasis added.)  Interpretation of this text is guided by the principles

that the Constitution's "words and phrases were used in their normal and ordinary as distin-guished from technical meaning" and that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 576, 634-35 (quotation marks omitted).

The text of the Amendment's operative clause expressly protects a right to carry firearms. The Supreme Court in *Heller* made clear that "[a]t the time of the Founding, as now, to 'bear' *meant* to 'carry.' " *Id.* at 584 (emphasis added).   Consequently, *Heller* ruled that the phrase to "bear arms" "meant (as it continues to mean today)," to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defen-sive action in a case of conflict with another person." *Id.* at 584, 586 (quotation marks omit-ted).[10]  Specifically, the Second Amendment "guarantee[s] the individual right to … carry wea-pons in case of confrontation." *Id.* at 592.  *Heller* thus confirmed what had long been the under-standing of the Second Amendment prior to the doctrinal confusion that reigned in the lower federal courts after the "virtually unreasoned" *Miller* decision in 1939.  *Id.* at 621-24 & n.24. Indeed, it was precisely this settled construction of the Second Amendment right that caused Chief Justice Taney such alarm in the *Dred Scott Case*.  In 1857 the Supreme Court recoiled from recognizing blacks as part of "We the People of the United States," because if they were,

---

[10] For the proposition that "bear" meant "to carry," *Heller* cited, *inter alia,* the 1773 edi-tion of Samuel Johnson's dictionary, 1 DICTIONARY OF THE ENGLISH LANGUAGE 161 (4th ed.) (reprinted 1978); N. WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (re-printed 1989);  T. SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1796).  *See Heller,* 554 U.S. at 583-84. Cunningham's important 1771 legal dictionary, repeatedly cited in *Heller,* indicated that "bearing arms" encompassed carrying weapons outside the home; it gave as an example a law limiting the rights of " 'Servants and labourers' " to use of " 'bows and ar-rows on Sundays*, &* c. and not bear other arms.' " *Heller*, 554 U.S. at 588-89 (italics omitted).  It is inconceivable that the Framers envisioned using a bow and arrow inside one's home.

then it was beyond cavil that they, too, just like white citizens, would be constitutionally entitled "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857).

The Second Amendment's text negates the proposition that the right to carry firearms is limited to the home. Such a limitation on the right would read the term "bear" out of the Constitution, for the Second Amendment also protects the right to "keep" arms – that is, to "have weapons." *Heller*, 554 U.S. at 582. The explicit textual guarantee of the right to "bear" arms would mean nothing if it did not protect the right to "bear" arms outside of the home where they are "kept." The most fundamental canons of construction forbid any interpretation that would relegate this language to the status of meaningless surplusage. *See, e.g, Wright v. United States*, 302 U.S. 583, 588 (1938) ("every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added."). The Third Amendment confirms that the authors of the Bill of Rights knew how to draft a constitutional right limited to the confines of the home; they did not write such a limited scope into the Second Amendment. *See* U.S. Const. amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.").

Indeed, even putting the text of the Second Amendment to one side, it would be more than a little strange to interpret "the individual right to possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, as applying only in the privacy of the home, and not out in public where one is more likely to experience "confrontation." Just as the First Amendment's protection of speech would be crippled if its scope did not extend to " 'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks," *United States v. Grace*, 461 U.S. 171, 177 (1983), so the Second Amendment's right to "bear

arms" would mean little if that right did not extend beyond one's front door.[11]  This common sense animates the Supreme Court's ruling that the Second Amendment was originally understood to guarantee the right to "wear, bear, or carry [weapons] upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person," *Heller*, 554 U.S. at 584.

It is essential to keep in mind that the Second Amendment did not create a new right – it "codified a *pre-existing*" one.  *Id.* at 592 (emphasis in original).  The "right … long … understood to be the predecessor to our Second Amendment" was the provision in the English Bill of Rights  stating that individuals " 'may have arms for their defense suitable to their conditions and as allowed by law.' "  *Id.* at 593 (quoting 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)).  By the time our Constitution was written, the right to bear arms "had become fundamental for English subjects" and was "understood to be an individual right protecting against both public and private violence."  *Id.* at 593-94.  It is equally clear that this right extended to carrying arms for protection against violence *in public*.

This is apparent from Blackstone's discussion of the right to arms.  In language echoed by Texas to the Supreme Court, Blackstone classified the right of British subjects "of having arms for their defence" as among "auxiliary" rights "which serve principally as barriers to protect and maintain inviolate the three great and primary rights, of personal security, personal liberty, and private property."  1 BLACKSTONE COMMENTARIES *136, *139; *see also* Tex. *McDonald* Br. 6 ("the right to bear arms provides the foundational bulwark against the deprivation of all our other rights").  The right to arms, Blackstone explained, "is indeed a public allowance … of the natural right of resistance and self-preservation; when the sanctions of society and laws are found

---

[11] In *Heller* the Court interpreted the Second Amendment in light of the text and interpretation of the First Amendment. *See* 554 U.S. at 580, 582, 591, 595, 626, 635.

insufficient to restrain the violence of oppression."  1 BLACKSTONE COMMENTARIES *139; *id.* at

*140 ("the subjects of England are entitled … to the right of having and using arms for self-

preservation and defence").  Inasmuch as threats to liberty, security, and property know no

bounds, a right to arms limited to the home plainly would have been insufficient to meet its high

purposes.

      Other British sources confirm that the right to arms was understood to extend to carrying

arms in public.  By the late 17th century, the English courts recognized that it was the practice

and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330

(1686).  In 1780, the Recorder of London – the most senior justice of England's national criminal

court and "the foremost legal advisor to the city," *Parker*, 478 F.3d at 382 n.8 – addressed the

"limits and extent of the rights of the people … to bear arms." *Legality of the London Military

Foot-Association* (1780), *reprinted in* WILLIAM BLIZARD, DESULTORY REFLECTIONS ON POLICE

59, 59 (1785) (emphasis in original).  He started from the premise that the "right" of the king's

subjects "to have arms for their own defense, and to use them for lawful purposes, is most clear

and undeniable," and explained that the "lawful purposes, for which arms may be used," include

"immediate self-defense, … suppression of violent and felonious breaches of the peace, and as-

sistance of the civil magistrate in the execution of the laws, and the defence of the kingdom

against foreign invaders."  *Id.* at 63.  Indeed, "whenever these occasions occur, the use of arms

becomes not only the *right*, but the *duty*," of those "able to bear them."  *Id.* (emphasis added).  It

is plain that these lawful purposes protected by the right required carrying arms *publicly*.  And in

the early 1790's, Edward Christian, a lawyer and professor of the laws of England at the Univer-

sity of Cambridge, published an edition of Blackstone's Commentaries in which he noted that

"every one is at liberty to keep or carry a gun, if he does not use it for the destruction of game," 2

BLACKSTONE COMMENTARIES *411-12 n.2 (Christian ed., 1794), providing further evidence that the right to bear arms extended to public spaces.

The right to bear arms was understood by the Framers of our Constitution to have similar scope. In *Heller*, the Court noted a wealth of support for this interpretation of the public scope of the right to bear arms. "The most prominent examples are those most relevant to the Second Amendment: Nine state constitutional provisions written in the 18th century or the first two decades of the 19th, which enshrined a right of citizens to 'bear arms in defense of themselves and the state' or 'bear arms in defense of himself and the state.' " *Heller*, 554 U.S. at 584-85 & n.8. Just as "it is clear from those formulations that 'bear arms' did not refer only to carrying a weapon in an organized military unit," *id.* at 585, it is likewise clear that "bear arms" did not refer only to toting a weapon from room to room in one's house. Citizens could not effectively bear arms either in defense of themselves or in defense of the state if they were not free to carry their weapons where they were needed for both purposes. As *Heller* recognized, "Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right … as a recognition of the natural right of defense 'of one's person *or* house,' " demonstrating that the right of "bearing arms" in defense of the person was understood to extend beyond the home. 554 U.S. at 585 (quoting 2 COLLECTED WORKS OF JAMES WILSON 1142, at n.x (K. Hall & M. Hall eds., 2007)) (emphasis added).[12] In defending British soldiers against murder charges in the Boston Massacre, John Adams recognized that "here every private person is authorized to arm himself; and on the

---

[12] *See* 1 W. HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 72 (1716) (there is "no Reason why a Person, who without Provocation, is assaulted by another *in any Place whatsoever*, in such a Manner as plainly shews an Intent to murder him, … may not justify killing such an Assailant") (emphasis added); *id.* at 71 ("the killing of dangerous rioters [may be justified] by any private persons, who cannot otherwise suppress them, or defend themselves from them, inasmuch as every private person seems to be authorized by the law to arm himself for the purposes aforesaid").

strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence, not for offence.  That distinction is material, and must be attended to."  John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds. 1905).  In other words, while arguing that the British soldiers acted in self-defense, Adams knew that he had to acknowledge the universal understanding that the inhabitants of Boston had the right to carry arms publicly for their own defense.

The practices of the Founding generation confirm that the right to carry a firearm was well-established.  Judge St. George Tucker observed, "In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 BLACKSTONE COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803). The firearm of choice for eighteenth-century civilians who traveled or lived in urban areas was the pistol, because it was made to fit in pockets. *See* GEORGE C. NEUMANN, THE HISTORY OF THE WEAPONS OF THE AMERICAN REVOLUTION 151 (1967).  *See also* NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (defining "pistol" as "a small fire-arm" and noting that "small pistols are carried in the pocket").  And the Founders regularly exercised their right. For example, George Washington carried a pistol for self-defense and is said to have drawn one to fend off a "desperado" who threatened to shoot him on his ride from Mt. Vernon to Alexandria shortly after the Revolutionary War. *See* BENJAMIN OGLE TAYLOE, IN MEMORIAM: ANECDOTES AND REMINISCENCES 95 (Washington, D.C., 1872), *available at* http://www.archive .org/details/inmemoriambenjam00wats (last accessed May 10, 2011).  John Adams brought a pistol with him when he sailed to France in 1778. *See* DAVID MCCULLOUGH, JOHN ADAMS 177

(2001). Thomas Jefferson wrote his nephew, "Let your gun therefore be the constant companion of your walks." *See* THOMAS JEFFERSON, WRITINGS 816–17 (letter of August 19, 1785) (Merrill D. Peterson ed., 1984). And Dr. Joseph Warren, a prominent Boston patriot, carried pistols when making his rounds. RICHARD FROTHINGHAM, LIFE AND TIMES OF JOSEPH WARREN 452 (Boston: Little, Brown, & Co., 1865).

Likewise, in 18th-century England, it was recognized that an individual's right to bear arms sometimes became a duty to bear arms in defense of the realm and to maintain the king's peace by "suppression of violent and felonious breaches of the peace." *Legality of the London Military Foot-Association, supra,* at 63. The same right, and duty, to bear arms outside the home was recognized in this country. As the Court noted in *Heller,* "[m]any colonial statutes *required* individual arms-bearing for public-safety reasons." 554 U.S. at 601 (emphasis added).[13]

The Second Amendment's "prefatory" clause cements the interpretation of the right to carry protected by the operative clause. The prefatory clause "announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 599. Indeed, "it was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id*. In *Nunn v. State*, the Georgia Supreme Court "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause," *Heller*, 554 U.S. at 612-13:

> [T]he right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as

---

[13] *See, e.g.,* An Act for the Better Security of the Inhabitants, By Obliging the Male White Persons to Carry Fire Arms To Places of Public Worship (Ga. 1770) *in* A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 157-58 (1800); *see also* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 139 (1994) (citing several examples of laws that "required colonists to carry weapons").

> are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained:  the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State.

*Nunn v. State*, 1 Ga. 243, 251 (1846) (emphasis omitted).  A right to bear arms limited to the home plainly would be ill-suited to the purpose of "the rearing up and qualifying a well-regulated militia," for if citizens could be prohibited from carrying arms in public they simply could not act as the militia at all.

Of course, "the militia was not the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Heller*, 554 U.S. at 599.  Hunting, like self-defense from assailants at large, cannot be conducted by those bearing arms only within their homes.  Thus *Heller* concluded that, although "self-defense had little to do with the right's *codification*; it was the *central component* of the right itself." *Id*. (emphasis in original).

### B.    Texas' Prohibition Cannot be Squared with Limitations Historically Understood as Consistent with the Second Amendment.

Like other constitutional rights, the right to bear arms is "not unlimited," and Plaintiffs do not claim a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.  The potential limits on firearms carriage mentioned by *Heller*, however, *underscore* the impermissible infringement wrought by Texas on Plaintiffs' Second Amendment rights.

First, *Heller* held that "the sorts of weapons protected" by the Second Amendment are limited to those "in common use." *Id*. at 627 (quotation marks omitted).  The handguns Texas bars Plaintiffs from carrying not only are "in common use" – they are the "quintessential self-

defense weapon," *id*. at 629, "overwhelmingly chosen by American society for that lawful purpose," *id.* at 628.

Second, the Court cautioned that its decision should not "be taken to cast doubt on longstanding prohibitions on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id*. at 626.  But it would make no sense for the Court to carve out this narrow limitation if the Second Amendment allowed states to ban the carrying of firearms in *all* public spaces, not just particularly sensitive ones.

Third, the Court distinguished between laws regulating the *manner* in which firearms may be borne for self-defense purposes and those *prohibiting* carriage, implying that the latter are plainly illegitimate.  *Compare id.* at 626 ("the majority of the 19th-century courts to consider the question held that prohibitions on carrying *concealed* weapons were lawful under the Second Amendment or state analogues") (emphasis added), *with id.* at 629 (" 'A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.' ") (quoting *State v. Reid*, 1 Ala. 612, 616-17 (1840)).  Indeed, the Court characterized laws broadly prohibiting handgun carriage as among the "few" that "come close to the severe restriction of the District's handgun ban" the Court struck down.  *Id*.  Plaintiffs assert no constitutional right to carry concealed weapons; although we contend that bearing firearms outside the home for purposes of self-defense is at the core of the Second Amendment right identified in *Heller*, the choice of concealed or open carry is left to Texas because either facilitates the right of armed self-defense.

Because *Heller* did not purport to map "the full scope of the Second Amendment," these potential limits on the scope of the Second Amendment for the most part are only that:  potential

limits, subject to revision following the necessary "historical analysis." *Id*. at 626.  Unlike the

laws at issue here, however, as an historical matter these limits arguably find support in the tradi-

tional ban on going armed to terrify the populace, a prohibition which was understood in 18th

century England to be based in the common law and codified in the Statute of Northampton, 2

Edw. 3., c. 3 (1328).  *See*  C. Kevin  Marshall, *Why Can't Martha Stewart Have a Gun?*, 32

HARV. J. L. & PUB. POL'Y 695, 716 (2009) ("English law in the 1700s depended on just one

common-law rule for the regulation of arms: a prohibition against going armed so as to terrify

the people."); 4 BLACKSTONE COMMENTARIES *148-49 ("The offense of riding or going armed,

with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good

people of the land, and is particularly prohibited by the statute of Northampton, 2 Edw. III. c.

3."); 1 W. HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 135 (1716) ("[W]here a man

arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a

Terror to the People, … is said to have been always an Offence at Common Law, and is strictly

prohibited by many Statutes.") (citing Statute of Northampton); *Sir John Knight's Case*, 87 Eng.

Rep. 75 (K.B. 1686) ("[T]he meaning of the statute [of Northampton] was to punish people who

go armed to terrify the King's subjects.  It is likewise a great offence at the *common law*, … and

therefore this Act is but an affirmance of that law.").

The discussion of "affrays" – breaches of the public peace – in "William Hawkins's

widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331

(2001), published in 1716, illustrates the point.  Although the legal definition of an "affray" typi-

cally required violence, Hawkins recognized that "in some Cases there may be an Affray where

there is no actual Violence; as where a Man arms himself with dangerous and unusual Weapons,

in such a Manner as will naturally cause a Terror to the People, which is said to have been al-

28

ways an Offence at Common Law, and is strictly prohibited by" the Statute of Northampton. 1 HAWKINS 135. But, Hawkins continued, "no wearing of Arms is within the meaning of this Statute, unless it be accompanied with such Circumstances as are apt to terrify the People;" thus, "Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons … for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them." *Id*. at 136. While this prohibition on bearing arms to terrify may therefore be understood as an antecedent to the potential exceptions on the right to bear arms mentioned by the Court in *Heller*, it actually militates *against* the validity of a law like Texas' that broadly restricts law-abiding citizens from peaceably carrying commonly used weapons for their own protection.

Hawkins' understanding of the offense of affray was echoed in early America. *See, e.g.*, 3 BIRD WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804) (reprinting lectures delivered in 1790 and 1791) ("In some cases, there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people") (citing Hawkins). But no person committed this offence and fell within this narrow exception to the right to bear arms "unless such wearing be accompanied with such circumstances as are apt to terrify the people; consequently the wearing of common weapons, or having the usual number of attendants, merely for ornament or defence, where it is customary to make use of them, will not subject a person to the penalties of this act." WILLIAM W. HENING, THE NEW VIRGINIA JUSTICE, COMPRISING THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE, IN THE COMMONWEALTH OF VIRGINIA 49-50 (2d ed. 1810) (citing Hawkins). Thus, although "going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land … it should be remembered, that in

29

this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822).

"[I]t is to be remembered that the carrying of a gun *per se* constitutes no offence. For any lawful purpose … the citizen is at perfect liberty to carry his gun. It is the wicked purpose – and the mischievous result – which essentially constitute the crime." *State v. Huntly*, 25 N.C. (3 Ired.) 418, 422-23 (1843). Indeed, the Tennessee Supreme Court went so far as to hold that this common-law offense could not be carried over from England due to the State's guarantee of the right to bear arms: "after so solemn an instrument hath said the people may carry arms," the Court explained, it could not "be permitted to impute to the acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby." *Simpson v. State*, 13 Tenn. 356, 360 (1833).

Nor do statutes in effect during the founding era support Texas' restrictive laws. To the contrary, typical regulations of arms-bearing at that time were narrowly framed for specific purposes, such as laws codifying the common-law offense of carrying unusual arms to the terror of the people,[14] regulating the carrying of guns in certain locations to protect wildlife,[15] and prohibiting slaves from bearing arms.[16] In fact, as *Heller* explained, many jurisdictions went the other

---

[14] *See* An Act Forbidding and Punishing Affrays (Va. 1786) *in* A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 33 (Augustine Davis ed.,1794).

[15] *See, e.g.*, An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin-Cove-Island, Otherwise Called Naushon-Islands, and on Nennemesset-Island; and Several Small Islands Contiguous, Situated in the County of Dukes'-County *in* LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 34 (Mass. 1790) (restricting gun carriage on parts of named islands absent a "special licence" or "sufficient reason" for such carriage).

[16] *See, e.g.*, An Act for the Better Ordering and Governing Negroes and Other Slaves in this Province, and to Prevent the Inveigling or Carrying Away Slaves from Their Masters or Employers (Ga. 1765) *in* ACTS PASSED BY THE GENERAL ASSEMBLY OF GEORGIA 256 (1765) (mak-

way and "*required* individual arms-bearing for public-safety reasons." 554 U.S. at 601 (emphasis added).  *See supra* at 25 & n.13.

Finally, although such laws were not in place when the Second Amendment was ratified, later in the 19th century some state legislatures started to ban the carrying of concealed firearms. The first state high court to consider such a ban struck it down under the state constitution's right-to-arms provision, *see Bliss v. Commonwealth*, 12 Ky. 90 (1822), but by the end of the 19th century, a "majority of the … courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  *Heller*, 554 U.S. at 626.  Although it is uncertain whether banning concealed firearms could be reconciled with the Second Amendment, that question is not before this Court.  To decide this case the Court need only determine whether banning *all* carriage, concealed *and* open, violates the Constitution.  Plaintiffs do not seek recognition here of a constitutional right to bear concealed firearms.

Nineteenth century cases upholding bans on concealed weapons "reflected a belief that there would seldom be reason to conceal a weapon on one's person unless one had a criminal intent.  The presumption of criminal intent may well have been sensible in a world where the open carry of weapons was common and socially accepted, as it may have been in Georgia in 1846 and Louisiana in 1850.  But the world of 1791 may have been different, and America today is certainly very different." Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 U.C.L.A. L. REV. 1343, 1361 (2009).  Thus in upholding bans on concealed arms, the courts emphasized that laws seeking only "to suppress the practice of carrying certain weapons *secretly* … do[] not deprive the citizen of his natural right of self-defence, or of his consti-

---

ing it unlawful for "any slave, unless in the presence of some white person, to carry and make use of fire-arms," subject to limited exceptions).

tutional right to keep and bear arms," *Nunn v. State*, 1 Ga. 243, 251 (1846), because such laws

merely regulate "the manner in which arms shall be borne," *State v. Reid*, 1 Ala. 612, 616

(1840).  *See also State v. Chandler*, 5 La. Ann. 489 (1850).  The same is not true, of course, of

laws that prohibit any carrying of firearms, whether concealed or not, and 19th century courts

were accordingly much less receptive to such laws.  *See Nunn*, 1 Ga. at 251 (striking down ban

on carrying pistols openly while upholding ban on carrying concealed weapons); *Andrews v.*

*State*, 50 Tenn. 165, 187 (1871) (striking down law prohibiting carrying a pistol in any manner);

*State v. Reid*, 1 Ala. 612, 616-17 (1840) ("A statute which, under the pretence of regulating,

amounts to a destruction of the right, or which requires arms to be so borne as to render them

wholly useless for the purpose of defence, would be clearly unconstitutional.").[17]

## IV.    TEXAS' PROHIBITION ON 18-TO-20-YEAR-OLDS CARRYING HANDGUNS CANNOT SURVIVE ANY LEVEL OF HEIGHTENED SCRUTINY.

### A.    Only Strict Scrutiny Would Be Consistent With *Heller*.

The foregoing textual and historical analysis is required under *Heller* and is dispositive of

this case. But even if it were appropriate to import into Second Amendment jurisprudence the

familiar "tiers-of-scrutiny" analysis from free speech and equal protection doctrine, it is clear

that strict scrutiny must be applied here.  *Heller* and *McDonald* mandate that any level of scruti-

ny analysis begin with the recognition that the individual right to bear arms in self-defense is a

*fundamental* enumerated right.  *McDonald* declared that this right was considered "fundamental

by those who drafted and ratified the Bill of Rights," 130 S. Ct. at 3037, and that "the Framers

---

[17]In 1871 the Texas Supreme Court upheld the state's law "regulating and in certain cases prohibiting the carrying of pistols," but did so on the erroneous rationale – expressly repudiated by *Heller* – that pistols were not "arms" protected by the Second Amendment. *English v. State*, 35 Tex. 473, 473, 474-76 (1871).

and ratifiers of the Fourteenth Amendment" likewise "counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at 3042.[18]

Although it did not have occasion to hold strict scrutiny applicable to regulations infringing on the core of the Second Amendment, the *Heller* Court reaffirmed that there is " 'narrower scope for operation of the presumption of constitutionality…when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments.' " 554 U.S. at 628 n.27 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)).   In the Fifth Circuit, as elsewhere, "[s]trict scrutiny is required" if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *Richard v. Hinson*, 70 F.3d 415, 417 (5th Cir. 1995).[19]   To conclude, as some courts have in the wake of *Heller*, that Second Amendment rights deserve less protection than other fundamental rights is to conclude, contrary to what *is* explicit in *Heller* and *McDonald*, "that the Second Amendment should be

---

[18] *See also id.* at 3036 (the "decision in *Heller* points unmistakably to [an affirmative] answer" to the question of "whether the right to keep and bear arms is fundamental to our scheme of ordered liberty") (emphasis omitted); *id.* at 3037 ("the right to bear arms was fundamental to the newly formed system of government"); *id.* at 3041 ("Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental."); *id.* at 3038 n.17 ("Abolitionists and Republicans were not alone in believing that the right to keep and bear arms was a fundamental right"); *id.* at 3040 (holding that the 39th Congress's "efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental"); *id.* at 3041 ("In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection."); *id.* at 3059 (Thomas, J., concurring in part and in judgment) (agreeing that "the right to keep and bear arms … is 'fundamental' to the American 'scheme of ordered liberty.' ").

[19] *See also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973) (when a law interferes with enumerated "fundamental constitutional rights," it is subject to "strict judicial scrutiny"); *id.* at 17 (if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution, [it] thereby requir[es] strict judicial scrutiny"); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 n.14 (1985) ("governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied"); *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2003) ("rights are fundamental if their source, explicitly or implicitly, is the Constitution," and "[s]trict scrutiny is appropriate" when a law "implicates … a fundamental right") (quotation marks omitted).

singled out for special—and specially unfavorable—treatment." *McDonald*, 130 S. Ct. at 3043.

*See also id.* at 3044 (plurality) (rejecting argument that the Second Amendment right should be

"treat[ed]…as a second-class right, subject to an entirely different body of rules than the other

Bill of Rights guarantees").

Thus, if *Heller*'s prescribed textual and historical analytical framework is to be spurned

in favor of importing one of the levels of scrutiny from other areas of constitutional doctrine,

strict scrutiny must be applied, and Texas' ban on 18-to-20-year-olds carrying handguns plainly

cannot survive such review.  Contrary to Justice Breyer's argument in *Heller*, 554 U.S. at 687-88

(Breyer, J., dissenting), the Court's underlying logic is entirely consistent with its dictum that

certain types of restrictions, such as possession of firearms by felons, are "presumptively law-

ful," *Heller*, 554 U.S. at 626-27 & n.26.  The *Heller* Court was simply offering the preliminary

observation that such laws appear to fall outside the scope of the Second Amendment right to

bear arms, just as perjury and obscenity have always been understood to be outside the scope of

the First Amendment right to free speech.  *See id.* at 635 ("The First Amendment contains the

freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity,

libel, and disclosure of state secrets, but not for the expression of extremely unpopular and

wrong-headed views.  The Second Amendment is no different.").  The Court had no occasion in

*Heller* to prematurely map the scope of the Second Amendment: "there will be time enough to

expound upon the historical justifications for the exceptions we have mentioned if and when

those exceptions come before us." *Id.*  In his concurring opinion in *McDonald*, Justice Scalia ex-

plained that "[t]he traditional restrictions [on the right to keep and bear arms] go to show the

scope of the right, not its lack of fundamental character."  *McDonald*, 130 S. Ct. at 3056 (Scalia,

J., concurring).  Strict scrutiny in the First Amendment context, after all, is not foreclosed by the

recognition that there are reasonable limits on the scope of the right.  *See United States v. Stevens*, 130 S. Ct. 1577, 1584-86 (2010) (categories of speech not protected by First Amendment are based on historical exemptions at time of the Framing and not judicial interest-balancing).[20]

**B.      Under *Heller*, Intermediate Scrutiny Is Unacceptable For Laws, Like Those Challenged Here, That Infringe the Core Second Amendment Right of Armed Self-Defense by Law-Abiding Citizens.**

*Heller* forecloses any argument that laws that burden core Second Amendments rights should be subject to some form of intermediate scrutiny.  In his dissent in *Heller*, Justice Breyer argued that the proper standard of review should be drawn from "cases applying intermediate scrutiny" in the First Amendment context, such as *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997).  554 U.S. at 704 (Breyer, J., dissenting); *see also id.* at 689-90, 696.  He contended that "[t]here is no cause here to depart from the standard set forth in *Turner*." *Id.* at 705.[21]  Justice Breyer called his test "interest-balancing," rather than intermediate scrutiny, not because he was adopting a less demanding test, but because of his view that the government's interest in regulating firearms—some version of protecting the safety and lives of the public—would always be important or compelling.  In Justice Breyer's view, the government interest would always be sufficient and application of the test would involve a search for the appropriate degree of fit—that is, interest-balancing.  *See id.* at 689 ("I would simply adopt such an interest-balancing inquiry explicitly.").  Thus Justice Breyer's proposed interest-balancing test was nothing other than intermediate scrutiny, and the *Heller* court rejected it, however it might be labeled:

---

[20]  *See, e.g., United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("[W]e think the better reading, based on the text and the structure of *Heller*, is … that these longstanding limitations [*e.g.* for possession by felons] are exceptions to the right to bear arms.").

[21]  It is equally revealing that Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428 (1992).  *See Heller*, 554 U.S. at 690 (Breyer, J., dissenting).  That is the case on which the United States, appearing as an *amicus* in *Heller*, principally relied in unsuccessfully urging the Court to adopt intermediate scrutiny.  *See* Brief of United States at 8, 24, 28, *District of Columbia v. Heller,* No. 07-290 (U.S. Jan. 2008).

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.…The Second Amendment,…[l]ike the First,…is the very *product* of an interest-balancing by the people—which Justice Breyer would now conduct for them anew.

*Id.* at 634-35 (emphasis in original). *See also McDonald*, 130 S. Ct. at 3050 (plurality) ("[W]hile [Justice Breyer's] opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion."). Therefore, *Heller* forbids the application of mere intermediate scrutiny to a regulation, such as that here, that impinges upon the core Second Amendment right of armed self-defense.

The Fifth Circuit has not had occasion to decide whether strict scrutiny or some lesser standard applies to challenges that implicate the core Second Amendment rights of law-abiding adults. *See, e.g., United States v. Everist*, 368 F.3d 517, 519 n.1 (5th Cir. 2004) (rejecting Second Amendment challenge to felon-in-possession law, and noting that "[w]e need not decide whether the Second Amendment's boundaries are properly defined through strict scrutiny analysis"). Therefore, nothing in the Fifth Circuit's decisions prevents this Court from following the direction set by the Supreme Court in *Heller*, which rejected intermediate scrutiny or similar forms of interest-balancing for claims involving state regulations of law-abiding citizens' core Second Amendment right to armed self-defense.

C.      An "Undue Burden" Analysis Is Simply Another Form of the Interest-
        Balancing That Was Emphatically Rejected in *Heller*.

Some have argued that the "undue burden" analysis employed in abortion cases should be imported into the Second Amendment context.  There is absolutely no support for this.[22]  As an initial matter, the right to keep and bear arms is expressly guaranteed by the Bill of Rights, while the right to abortion is an unenumerated, non-textual right that emanates from the "penumbras" of other constitutional provisions.  *Roe v. Wade*, 410 U.S. 113, 152 (1973).  Furthermore, the Supreme Court adopted the undue-burden test in the abortion context because there are two competing constitutional rights at stake in such cases, not one, and thus interest-balancing is inherent in the nature of "the central holding in *Roe*" itself.  *See Planned Parenthood v. Casey*, 505 U.S. 833, 873 (1992) (plurality).  But in the Second Amendment context, the Court has ruled that such balancing is not inherent in the nature of the right.  *See Heller*, 554 U.S. at 634-35 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach…. The Second Amendment … is the very *product* of an interest balancing by the people") (emphasis in original); *id.* at 636 ("the enshrinement of constitu-

---

[22] Regardless of whether it was correctly decided, nothing in the reasoning of *Nordyke v. King*, ___ F.3d___, No. 07-15763, 2011 WL 1632063 (9th Cir. May 2, 2011), would preclude application of strict scrutiny in this case.  In *Nordyke*, the Ninth Circuit held that "regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment."  2011 WL 1632063, at *6.  While the court did not determine what form of heightened scrutiny applies to such laws, *id.* at *6 n.9, as we have explained strict scrutiny would be the appropriate standard.  And while the court held that a law prohibiting gun shows on county fairgrounds did not substantially burden Second Amendment rights, the court emphasized that the plaintiffs in that case *did* "*not* allege that they wish to carry guns on county property for the purpose of defending themselves while on that property."  *Id.* at *7 (emphasis added).  Plaintiffs here, of course, *do* wish to carry a handgun for the purpose of defending themselves, and Texas prohibits them from doing so not just on publicly owned property, but anywhere in the State outside of their homes or automobiles.

tional rights necessarily takes certain policy choices off the table"); *McDonald*, 130 S. Ct. at 3045, 3047 (plurality).

Although the dissenters in *Heller* did not cite *Casey*, they did propose the very analysis of burdens that the City here urges upon this Court: "The ultimate question is whether the statute imposes burdens that, when viewed in light of the statute's legitimate objectives, are dispropor-tionate." *Heller*, 554 U.S. at 693 (Breyer, J., joined by Stevens, Souter and Ginsburg, JJ., dissent-ing). Asking whether a law "*disproportionately* burden[s] [Second] Amendment-protected inter-ests," *id.* at 714 (emphasis in original), is the same as asking whether the law imposes an *undue* burden. *See also id.* at 682 (asking whether "the law imposes a burden upon gun owners that seems proportionately" too great); *id.* at 689-90 (asking "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects"). The majority of the *Heller* Court fully considered the dissent's approach of analyzing the "propor-tion[ality]" of the "burden" on Second Amendment rights, *id.* at 631—and flatly rejected it, *id.* at 634-35. This Court should do the same.

**D.      The Texas Prohibition Fails Any Level of Heightened Scrutiny.**

As we have explained above, if the Court chooses to engage in a level-of-scrutiny analy-sis, strict scrutiny is the only appropriate standard. The age restriction at issue here cannot satis-fy the "most searching examination," *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003), entailed by application of this "most exacting scrutiny," *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Indeed, the Texas law prohibiting 18-to-20-year-olds from carrying handguns outside of the home or au-tomobile is so poorly tailored to any substantial government objective that it fails even interme-diate scrutiny. While intermediate scrutiny, unlike strict scrutiny, does not require the govern-ment to employ the *least* restrictive means to achieve its stated purpose, it does require that a re-

striction be "narrowly tailored to serve a significant government interest." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).  In other words, a restriction must be "*substantially* related to the achievement" of the government's objective, *United States v. Virginia*, 518 U.S. 515, 533 (1996) (emphasis added).  Only the government's genuine objectives will do, not "*post hoc*" rationales "invented…in response to litigation," and intermediate scrutiny does not permit the government to "rely on overbroad generalizations" to allocate benefits and burdens.  *Id.*

Texas can point to no government interest that is substantially advanced by banning law-abiding civilian 18-to-20-year-olds from carrying handguns for self-defense.  To begin with, the state's purpose in enacting its initial ban on carrying handguns cannot justify its current regime singling out 18-to-20-year-olds for disfavored treatment.  That law as originally enacted applied to all adults, not just a subset of them, and was "intended to suppress" what was then viewed as "the absurd and vicious practice of bearing upon the person such weapons as pistols."  *Waddell v. State*, 37 Tex. 354, 355 (1872); *see also Christian v. State*, 37 Tex. 475, 476 (1872) ("The whole object and purpose of the law was to prohibit the carrying such weapons about the person for unlawful, offensive, or defensive purposes.").  Given that Texas now allows law-abiding adults of all ages *except* 18-to-20-year-olds to obtain a CHL and carry a concealed handgun, the State plainly no longer views the practice as inherently "vicious" or "absurd," nor does it attempt generally to prohibit the practice of carrying handguns for all purposes.[23]

---

[23] Another purpose that some have suggested Texas' original ban served—the Reconstruction Legislature's aim of disarming ex-Confederates—also lost any legitimacy it ever had long ago. *See* Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 BAYLOR L. REV. 629, 658 (1989) ("The act was one of a series of controversial measures passed by the Reconstruction legislature in 1871, a year in which Republicans were consolidating their political power over disenfranchised ex-Confederates.").

The legislative history of the concealed-carry law indicates that at least a few legislators harbored an inchoate concern that adults under 21 are not sufficiently "mature" to carry handguns outside their homes and vehicles.[24]  Although reducing criminal violence is a compelling government objective, the notion that banning 18-to-20-year-olds from carrying handguns will substantially advance that interest rests on several faulty premises.

*First*, it assumes that limiting the carrying of handguns by law-abiding citizens would reduce gun violence.  But even public health experts who zealously advocate handgun controls have concluded – in the wake of *Heller* – that, "based on available empirical data," there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home."  Philip J. Cook, Jens Ludwig, & Adam M. Samaha, *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 U.C.L.A. L. REV. 1041, 1082 (2009); *see also* DAVID HEMENWAY, PRIVATE GUNS, PUBLIC HEALTH:  A DRAMATIC NEW PLAN FOR ENDING AMERICA'S EPIDEMIC OF GUN VIOLENCE 165 (2004) ("A crucial step in the public health approach to injury prevention is the after-the-fact evaluation of public and private policies. It is important to know what has and what has not worked.  Unfortunately, sufficient scientific policy evaluations have not occurred in the areas of violence prevention in general and of firearms policy in particular.").  This conclusion is consistent with the findings of other leading studies that there is little evidence that gun control regulations such as the Texas law at issue here reduce criminal violence.  *See* Robert Hahn et al., *Firearms Laws and the Reduction of Violence:*

---

[24] *See* Texas House of Representatives Floor Debate, 74th Legislature, held on May 1, 1995 (on file at Texas State Legislature House Media Office) (Tape 2 Side B, 24:00) (Rep. Sidles:  "A moment ago you all defeated the 18 year old amendment because you thought 18 year olds weren't mature enough to handle a firearm."); Texas House of Representatives Floor Debate, 74th Legislature, held on May 1, 1995 (on file at Texas State Legislature House Media Office) (Tape 2 Side A, 24:45) (Rep. Wilson:  "We certainly feel that at least early out that we should keep the age of 21 [rather than 18] so that there is some level of maturity attained hopefully by then.").

*A Systematic Review,* 28 AM. J. PREV. MED. 40, 59 (2005) ("Based on findings from national law assessments, cross-national comparisons, and index studies, evidence is insufficient to determine whether the degree or intensity of firearms regulation is associated with decreased (or increased) violence."); CHARLES F. WELLFORD, JOHN V. PEPPER & CAROL V. PETRIE (eds.), FIREARMS AND VIOLENCE: A CRITICAL REVIEW 6 (2004) ("[E]xisting research studies and data include a wealth of descriptive information on homicide, suicide, and firearms, but, because of the limitations of existing data and methods, do not credibly demonstrate a causal relationship between the owner-ship of firearms and the causes or prevention of criminal violence or suicide.  The issue of substi-tution (of the means of committing homicide or suicide) has been almost entirely ignored in the literature.").

*Second*, the state's rationale assumes that *all* 18-to-20-year-olds who would lawfully car-ry a handgun if permitted to do so are too immature to carry a handgun.  But Texas plainly does not believe that *all* 18-to-20-year-olds are too immature to carry a handgun because it grants concealed carry permits to veterans and members of the military.  More generally, by permitting 18-to-20-year-olds to marry and to vote, by holding them criminally responsible as adults (even subjecting them to the death penalty), and permitting them to sentence someone (even to death) as a juror, the law of Texas plainly embodies the belief that adults aged 18-to-20 are sufficiently mature to make decisions that have even life-or-death consequences and to be held responsible for them. *See* TEX. FAM. CODE § 2.101 (Vernon 2010); TEX. ELEC. CODE 11.002(a) (Vernon 2010); TEX. PENAL CODE § 8.07(c) (Vernon 2010); TEX. GOV'T CODE §§ 62.101, 62.102(1) (Vernon 2010).  And presumably Texas would require 18-to-20-year-olds, like all other Texans, to successfully run a regulatory gauntlet before obtaining a Texas handgun permit.  A person cannot obtain a CHL if he or she is chemically dependent, a convicted felon, a convicted Class A

41

or B misdemeanant (within the past 5 years), charged with committing a felony or Class A or Class B misdemeanor, or generally "incapable of exercising sound judgment with respect to the proper use and storage of a handgun." *See* TEX. GOV'T CODE § 411.172(a) (Vernon 2010). Application of these regulatory requirements is designed to separate, among people of *all* ages, those who are too immature or are otherwise unfit to be permitted to carry a concealed weapon from those who are not. Texas' CHL permitting scheme thus plainly constitutes a far less restrictive means of achieving the Texas legislative goal than imposing an irrebutable legal presumption that every law-abiding adult under the age of 21who has not served in the military is unfit to carry a handgun.

Moreover, along with the application form, CHL applicants are required to submit two sets of fingerprints, evidence of handgun proficiency (demonstrated by completing a 10-hour course in which the applicant must pass a written examination and provide an "actual demonstration … of the applicant's ability to safely and proficiently use the applicable category of handgun," TEX. GOV'T CODE § 411.188 (Vernon 2010)[25]), criminal history information, authorization for inquiring into noncriminal history records, any history of treatment in a psychiatric hospital, and any treatment in a drug or alcohol rehab center in the past five years. *See* TEX. GOV'T CODE § 411.174 (Vernon 2010). All CHL applicants are subject to a criminal history record check, and the Department of Public Safety "conduct[s] any further record check or investigation the department determines is necessary" to determine "the eligibility of the applicant." TEX. GOV'T CODE § 411.176 (Vernon 2010). Given this stringent process, it is unsurprising that researchers have found that "concealed carry licensees [in Texas] had arrest rates far lower than the general

---

[25] Ms. Jennings, Ms. Harmon, and Mr. Payne have fulfilled this requirement. *See* Jennings Decl. ¶ 12, App. 11; Lawson Decl. ¶¶ 10-11, App. 24-25; Harmon Decl. ¶ 11, App. 6; Felker Decl. ¶¶ 11-12, App. 21; Payne Decl. ¶ 10, App. 16; Levick Decl. ¶¶ 12-13, App. 28.

42

population for every category of crime."  H. Sterling Burnett, National Center for Policy Analysis, *Texas Concealed Handgun Carriers:  Law-Abiding Public Benefactors* 1 (2000), *available at* http://www.ncpa.org/pub/ba324; *see also* Cook et al., *Gun Control After Heller* at 1082 ("The available data about [concealed carry] permit holders…imply that they are at fairly low risk of misusing guns.").  We are aware of no evidence demonstrating that this same pattern would not apply among those aged 18 to 20 were they permitted to obtain a CHL.

*Third*, the state's rationale assumes that 18-to-20-year-olds who *are* disposed toward violent criminal behavior will refrain from carrying a handgun if doing so is unlawful.  This is naïve and nonsensical—individuals willing to commit armed violence exposing them to severe and even capital punishment will not be deterred by the relatively minor sanction imposed for unlawfully carrying a handgun.  Indeed, this reality was acknowledged during the legislative debate over the CHL law. *See, e.g.*, Texas House of Representatives Committee Hearing Testimony for the Committee on Public Safety, 74th Legislature, held on Mar. 21, 1995 (on file with Texas State Legislature House Media Office) (Tape 1, Side A, 41:00) (Rep. Wilson: "any minor that is prone to want to carry a concealed handgun … they're going to do it regardless of whether this bill passes or not").

*Fourth*, the state's rationale ignores the fact that firearms, including handguns, are frequently used to defend against criminal violence.   Although the number of defensive gun uses is difficult to measure, data from the National Self-Defense survey "indicate that each year in the United States there are about 2.2 to 2.5 million defensive uses of guns of all types by civilians against humans, with about 1.5 to 1.9 million of the incidents involving use of handguns."  GARY KLECK & DON B. KATES, ARMED 222 (2001).  "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses."  WELLFORD ET AL., A CRITICAL REVIEW 103.  By

taking what the Supreme Court has recognized is the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629, out of the hands of law-abiding adults under 21, Texas prohibits individuals in the age cohort most likely to be attacked by armed assailants from defending themselves when out in public.  *See* U.S. Dep't of Justice, Bureau of Justice Statistics Special Report, *Weapon Use and Violent Crime* at 4 (Sept. 2003), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/wuvc01.pdf ("Younger persons, particularly those age 18-20, had higher rates of victimization by armed offenders.").  Any evaluation of the impact of Texas' prohibition must take this crime-reducing effect into account and weigh it against any speculative hope (which has been dismissed even by gun-control advocates) that denying handgun carriage by law-abiding adults would result in a decrease in crime.

In sum, there is no basis for concluding that the laws at issue here substantially advance any significant government interest.

## V. THE TEXAS PROHIBITION ON HANDGUN CARRIAGE DENIES THE EQUAL PROTECTION OF THE LAW TO LAW-ABIDING ADULTS UNDER THE AGE OF 21.

Because the Texas carriage ban infringes 18-to-20-year-olds' fundamental right to keep and bear arms, it is subject to strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment.  As explained above, the Texas law cannot begin to meet this standard, nor even a lesser standard of heightened scrutiny.

Equal protection analysis requires strict scrutiny of "classifications affecting fundamental rights."  *Clark v. Jeter*, 486 U.S. 456, 461 (1988); *see also Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976) ("equal protection analysis requires strict scrutiny of a legislative classification…when the classification impermissibly interferes with the exercise of a fundamental right"); *LeClerc v. Webb*, 419 F.3d 405, 415 (5th Cir. 2005) ("strict scrutiny is employed when a governmental body creates a classification that burdens a fundamental right"). As

discussed above, the Supreme Court has held that the right to keep and bear arms is fundamental. The law challenged here creates a classification that burdens that right.

Any attempt to justify Texas' ban on the fact that some of those between the ages of 18 and 21 commit crimes is without merit. A responsible, law-abiding adult's membership in a particular *group* cannot form the basis for a classification that infringes that adult's fundamental "*individual* right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592 (emphasis added); *cf. Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227 (1995) ("the Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*" and thus "a *group* classification long recognized as in most circumstances irrelevant and therefore prohibited…should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed") (emphasis in original, quotation marks omitted).

Are there proportionally more criminals in the 18-to-20 cohort than in other age brackets? Perhaps. But resolution of that factual issue is not necessary to decide this case. For if such a fact were sufficient to justify disarming *all* 18-to-20-year-olds, then the government could likewise disarm other demographic groups simply because some members of that cohort commits handgun crimes at a higher rate than the general population. The most obvious examples might be differentially higher gun-violence rates by males, or by the poor, or by certain racial groups. Could these groups therefore be generally disarmed? Plainly no.

Any argument based on the alleged criminality of adults under 21 also suffers from vast, and therefore fatal, overinclusiveness. Only a minuscule fraction of 18-to-20-year-olds engage in criminal violence: FBI and Census Bureau data indicate that fewer than 1% of this age group

was arrested for violent crimes in 2009.[26]  Texas thus classifies *all* 18-to-20-year-olds and strips them of their fundamental rights because of the sins of the few.  That is not how rights work under our Constitution.  *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("deeply etched in our law [is the theory that] a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand") (emphasis added); *Hodgson v. Minnesota*, 497 U.S. 417, 446-47 (1990) (" 'The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition.' ") (quoting *Parham v. J.R.*, 442 U.S. 584, 603 (1979)).

This is amply demonstrated by *Craig v. Boren*, 429 U.S. 190 (1976), in which the Supreme Court struck down an Oklahoma law that prohibited the sale of " 'nonintoxicating' 3.2% beer" to men under 21 but permitted sales to women 18 and over.  *Id.* at 190.  The Court rejected Oklahoma's attempt to rely on statistics showing that 18-to-20-year-old men were over *ten times* more likely (2% vs. 0.18%) than their female counterparts to have been arrested for "alcohol-related driving offenses."  *Id.* at 192, 201-02.  Although "such a disparity is not trivial in a statistical sense," the Court reasoned that "it hardly can form the basis for employment of a gender line as a classifying device."  *Id.*; *see also id.* ("Certainly if maleness is to serve as a proxy for drinking and driving, a correlation of 2% must be considered an unduly tenuous 'fit.' ").  That fit was insufficient to justify the discrimination, even though there is no right – let alone an enume-

---

[26] The calculation proceeds as follows, with an adjustment for the number of 18-to-20-year-olds to reflect the portion of the total U.S. population covered by the FBI arrest statistics: 66,357 violent crime arrests ÷ (13,212,495 x .781) 18-to-20-year-olds = .0064, or **0.64%** *See* FBI, *Crime in the United States 2009*, Table 38:  Arrests by Age, *available at* http://www2.fbi.gov/ucr/cius2009/data/table_38.html#overview; U.S. Census Bureau, *Monthly Postcensal Resident Population, by single year of age, sex, race, and Hispanic origin*, July 1, 2009 data, *available for download at* http://www.census.gov/popest/national/asrh/2009-nat-res.html.

rated constitutional right – to purchase beer.  *A fortiori*, the discrimination at issue here cannot survive equal protection scrutiny: "the principles embodied in the [fundamental right to keep and bear arms] are not to be rendered inapplicable by statistically measured but loose-fitting generalities."  *Id*. at 208-09.

To be sure, Texas law makes another classification in addition to the general distinction drawn between adults under 21 and those 21 and over.  Among adults under 21, Texas permits members of the armed forces (and veterans) to obtain concealed carry permits, while denying permits to all others.  It is difficult to imagine a classification more in tension with the animating purpose of the Second Amendment than one that reserves the right to bear arms exclusively for members of the armed forces.  The founding generation recognized what remains true today:  no shield of government can be relied upon to provide complete protection from violence.  The Founders therefore enshrined in the Constitution the right of *the people*, and not a select subset of them, to keep and bear arms.  Texas' ban cannot be reconciled with this fundamental constitutional guarantee.

## CONCLUSION

For these reasons, this Court should GRANT Plaintiffs' Motion for Summary Judgment.

Dated May 16, 2011                        Respectfully submitted,


                                          /s/ Charles J. Cooper
Fernando M. Bustos                        Charles J. Cooper*
State Bar No. 24001819                    David H. Thompson*
LAW OFFICES OF FERNANDO M. BUSTOS,        Peter A. Patterson*
P.C.                                      COOPER & KIRK, PLLC
P.O. Box 1980                             1523 New Hampshire Ave., NW
Lubbock, TX 79408-1980                    Washington, D.C.  20036
Tel: (806) 780-3976                       Tel: (202) 220-9600
Fax: (806) 780-3800                       Fax: (202) 220-9601
Email: fbustos@bustoslawfirm.com          Email: ccooper@cooperkirk.com

                                          Brian Koukoutchos*
                                          28 Eagle Trace
                                          Mandeville, LA 70471
                                          Tel:  (985) 626-5052
                                          Email:  bkoukoutchos@gmail.com

                                          *Admitted *pro hac vice*.

                                          *Counsel for Plaintiffs*

### <u>CERTIFICATE OF SERVICE</u>

On May 16, 2011, I electronically submitted the foregoing document with the clerk of court for the U.S. District, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/Charles J. Cooper
Charles J. Cooper
