**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

|  |  |  |
|---|---|---|
| **JAMES D'CRUZ; NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., AMERICA, INC.,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | **Case No. 5:10-cv-00141-C** **Judge Sam R. Cummings** |
| **STEVEN MCCRAW, in his official capacity as Director of the Texas Department of Public Safety,** | ) ) ) ) | |
| **Defendant.** | ) ) ) | |

## BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Fernando M. Bustos
State Bar No. 24001819
LAW OFFICES OF FERNANDO M. BUSTOS, P.C.
P.O. Box 1980
Lubbock, TX 79408-1980
Tel: (806) 780-3976
Fax: (806) 780-3800
Email: fbustos@bustoslawfirm.com

Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

Brian Koukoutchos*
28 Eagle Trace
Mandeville, LA 70471
Tel:  (985) 626-5052
Email:  bkoukoutchos@gmail.com

*Admitted *pro hac vice*.

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

I.    THE PLAINTIFFS HAVE STANDING. ....................................................................1

      A.    The NRA Members Have Standing. ........................................................1

      B.    The NRA Has Standing. ...........................................................................6

II.   THE CONSTITUTION PROTECTS THE RIGHT TO BEAR ARMS OF LAW-ABIDING
      CITIZENS BETWEEN AGES 18 AND 21.................................................................10

III.  THE CHALLENGED STATUTE CANNOT SURVIVE SCRUTINY UNDER THE SECOND
      AMENDMENT. .......................................................................................... 24

IV.   THE CHALLENGED STATUTES DENY PLAINTIFFS THE EQUAL PROTECTION OF THE LAW....31

# TABLE OF AUTHORITIES

**Cases**                                                                                                                      **Page**

*Andrews v. State*, 50 Tenn. 165 (1871) ...............................................................................12, 14

*Association of American Physicians & Surgeons, Inc. v. Texas Med. Bd.*,
    627 F.3d 547 (5th Cir. 2010) ...................................................................6, 7, 8

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979).................................................5

*Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005) .............................................................3

*Bliss v. Commonwealth of Kentucky*, 12 Ky. 90 (1822) ...........................................................13

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) .......................................................27

*Brinkley v. Hill*, 981 F. Supp. 423 (S.D. W. Va. 1997) ..............................................................20

*Brown v. Board of Education*, 347 U.S. 483 (1954)...............................................................19

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977)...........................................................19

*Carter v. Jury Comm'n of  Greene County*, 396 U.S. 320 (1970) .................................................22

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980) ....................27

*Cohen v. California*, 403 U.S. 15 (1971) ...............................................................19

*Craig v. Boren*, 429 U.S. 190 (1976)...............................................................27

*Daggett v. Commission on Governmental Ethics & Election Practices*,
    172 F.3d 104 (1st Cir. 1999) ...............................................................31

*Dearth v. Holder*, No. 10-5062, 2011 WL 1437379 (D.C. Cir. Apr. 15, 2011) ..........................1, 5

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................................................ *passim*

*Drummond v. Fulton County Dep't of Family & Children's Serv.*,
    563 F.2d 1200 (5th Cir. 1977) ...............................................................31

*Ellison v. Connor*, 153 F.3d 247 (5th Cir. 1998) ...............................................................2

*Fiallo v. Bell*, 430 U.S. 787 (1977)...............................................................20

*Gonzalez v. Village of W. Milwaukee*, No. 09CV0384, 2010 WL 1904977
    (E.D. Wis. May 11, 2010)...............................................................13

*Hatten v. Rains*, 854 F.2d 687 (5th Cir. 1988)...............................................................23

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) ...............................................5

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ....................................6, 8

*In re Gault*, 387 U.S. 1 (1967) ...............................................................19

*Indiana H.B.R.R. Co. v. American Cyanamid Co.*, 916 F.2d 1174 (7th Cir. 1990)......................31

*International Soc. for Krishna Consciousness of Atlanta v. Eaves*,
    601 F.2d 809 (5th Cir. 1979) ...............................................................5

*International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274 (1986)..................................................................9, 10

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005).............................................................2

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)........................................ *passim*

*Moore v. U.S. Dep't of Agriculture*, 993 F.2d 1222 (5th Cir. 1993) ............................. 2

*Nunn v. State*, 1 Ga. 243 (1846) ..................................................................................14

*Osterweil v. Edmonson*, No. 10-31090, 2011 WL 1758770 (5th Cir. May 5, 2011)......................4

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007),
  *aff'd, District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................1

*People v. Dawson*, 934 N.E.2d 598 (Ill. App. Ct. 2010) ..............................................13

*Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52 (1976) ...................19, 20

*Pointer v. Texas*, 380 U.S. 400 (1965)....................................................................17, 18

*Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591 (2d Cir. 1993) ....................8

*Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584 (7th Cir. 1993)...............8

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ...............................................................12

*Roper v. Simmons*, 543 U.S. 551 (2005).................................................................19, 21

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) .....................................................28

*Safford Unified Sch. Dist. # 1 v. Redding*, 129 S. Ct. 2633 (2009)..............................19

*San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996)........................5

*State v. Chandler*, 5 La. Ann. 489 (1850)....................................................................13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)............................19

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
  517 U.S. 544 (1996)..................................................................................................6

*United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003) ........................................24

*United States v. Everist*, 368 F.3d 517 (5th Cir. 2004)...............................................24

*United States v. Olson*, 473 F.2d 686 (8th Cir. 1973).................................................23

*United States v. Virginia*, 518 U.S. 515 (1996) .....................................................27, 30

*Williams v. Maryland*, 10 A.3d 1167 (Md. 2011).........................................................4

*Williams v. State*, 417 Md. 479 (2011) .......................................................................13

## Statutes and Legislative Materials

U.S. Const. art. I, §§ 2-3.................................................................................................23

U.S. Const. art. II, § 1...................................................................................................23

U.S. Const. amend. XXVI, § 1 .....................................................................................21

DEL. CONST. art. IV, § 1 (1792) ................................................................21

GA. CONST. art. IX (1777) .......................................................................21

KY. CONST. art. III, § 1 (1792) ................................................................21

MASS. CONST. pt. 2, ch. I, § 3, art. IV  (1780) ........................................21

MD. CONST. art. II (1776) ........................................................................21

N.C. CONST. art. VIII (1776) ...................................................................21

N.H. CONST. pt. 2, § XXVIII (1792) .......................................................21

PA. CONST. § 6 (1776) ..............................................................................21

S.C. CONST. art. I., § IV (1790) ...............................................................21

TENN. CONST. art. III, § 1 (1796) ............................................................21

TEX. ALCOHOLIC BEVERAGE CODE § 106.01 ........................................18

TEX. CIV. PRAC. & REMEDIES CODE § 129.001 ......................................18

TEX. FAM. CODE § 58.003(a) ....................................................................28

TEX. FAM. CODE § 58.003(c) ....................................................................29

TEX. FAM. CODE § 58.003(m) ...................................................................29

TEX. GOV'T CODE § 411.172(a)(2) .........................................................3, 7

TEX. GOV'T CODE § 411.172(a)(9) ...........................................................7

TEX. GOV'T CODE § 411.172(g) ..............................................................3, 7

TEX. GOV'T CODE § 411.174(a)(8)(B) ......................................................4

TEX. GOV'T CODE § 411.174(a)(9) ..........................................................29

TEX. PENAL CODE § 46.02 .....................................................................6, 16

TEX. PENAL CODE § 46.15 .........................................................................7

TEX. TRANSP. CODE § 521.204 .................................................................30

TEX. TRANSP. CODE § 521.222 .................................................................30

TEX. TRANSP. CODE § 521.223 .................................................................30

Militia Act of 1792, 1 Stat. 271 ...............................................................18

*An Act for Regulating the Choice and Services of Petit jurors*, 1786 ............22

*An Act relative to juries and verdicts*, N.J. Session Laws 1797, ch. DCLXXIV ..........22

## Other

1 BLACKSTONE COMMENTARIES *139 ........................................................23

1 THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER
      ORGANIC LAWS 574 (F. Thorpe ed. 1909) ..........................................21

1 THE PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 186
(I. Thomas & E.T. Andrews, eds., 1801)..................................................................22

4 THE COMMONPLACE BOOK OF THOMAS JEFFERSON: A REPERTORY OF HIS IDEAS ON
GOVERNMENT 314 (Gilbert Chinard ed., 1926) ......................................................28

42 AM. JUR. 2D INFANTS § 6 ................................................................................19

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683 (2007) ...........25, 26

ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY
IN THE UNITED STATES 277 (2000)........................................................................21

ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 728 (J.P. Mayer ed.,
George Lawrence trans., 1969)..............................................................................22

FED. R. CIV. P. 56(a)..........................................................................................30

FED. R. EVID. 201, 1972 ADVISORY COMMITTEE NOTE ................................................31

Form CHL-85, Authorization For Release of Records Affidavit, *at*
http://www.txdps.state.tx.us/InternetForms/Forms/CHL-85.pdf ............................29

Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*,
71 U. CIN. L. REV. 1345 (2003) ..........................................................................21

Pennsylvania Packet (Dec. 21, 1790), *in* 14 DOCUMENTARY HISTORY OF THE FIRST FEDERAL
CONGRESS (William C. diGiacomantonio et al. eds., 1996). ..................................33

RICHARD C. CORTNER, THE SUPREME COURT AND CIVIL LIBERTIES POLICY 123 (1975)..............19

THOMAS COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS 29 (1868)..............................21

Vikram David Amar, *Jury Service as Political Participation Akin to Voting*,
80 CORNELL L. REV. 203 (1995) ..........................................................................23

TO THE HONORABLE SAM CUMMINGS, U.S. DISTRICT JUDGE:

Plaintiff National Rifle Association (NRA) files this brief in response to Defendant's (Texas', or the State's) Motion for Summary Judgment, asking this Court to deny the State's Motion.[1]

## I.   THE PLAINTIFFS HAVE STANDING.

### A.   The NRA Members Have Standing.

Texas does not dispute that the NRA Members would have standing to bring this lawsuit if they submitted applications for concealed-handgun licenses (CHLs) and those applications were rejected by State officials.  *See* Texas SJ Br. 7.  Nor could Texas plausibly argue otherwise. *See, e.g., Parker v. District of Columbia*, 478 F.3d 370, 375-76 (D.C. Cir. 2007), *aff'd*, *District of Columbia v. Heller*, 554 U.S. 570 (2008) (holding that individual who applied for and was denied a registration certificate to own a handgun had standing to challenge laws prohibiting the issuance of such certificates); *see also Dearth v. Holder*, No. 10-5062, 2011 WL 1437379, at *2-*3 (D.C. Cir. Apr. 15, 2011).  And contrary to the State's contention, the NRA Members here have standing even though they are unable to complete the process to apply for, and thus have not formally been denied, CHLs.  Texas SJ Br. 5, 6.

1.  Although the State insists that the NRA Members must apply for and be denied concealed-carry permits to demonstrate that their "inability to obtain a CHL is caused by their age, as opposed to some other disqualifying facts," Texas SJ Br. 7, the NRA Members' declarations establish that they "meet all the requirements for obtaining a Texas CHL" except for

---

[1] The motion of proposed plaintiffs Rebekah Jennings, Brennan Harmon, and Andrew Payne to join this case as party-plaintiffs remains pending.  For ease of reference, we will refer to Ms. Jennings, Ms. Harmon, and Mr. Payne collectively as the "NRA Members," and references to "plaintiffs" include these three individuals as well as the NRA.  Because Ms. Jennings, Ms. Harmon, and Mr. Payne are members of the NRA, the outcome of this case will not turn on whether they are added as party-plaintiffs.  *See* Pls. SJ Br. 2 n.1.

"the age requirement," Pls. SJ App. 6 (Harmon Decl. ¶ 10); Pls. SJ App. 11 (Jennings Decl. ¶ 11); Pls. SJ App. 16 (Payne Decl. ¶ 9).  Moreover, the existence of some individualized basis for ineligibility would not bar a plaintiff from challenging the State's categorical decision to bar all individuals under 21 (aside from those who have served in the military) from carrying handguns. *See Heller*, 554 U.S. at 635 (invalidating categorical prohibition on handgun registrations but leaving open the possibility that plaintiff might be "disqualified from the exercise of Second Amendment rights" on some individualized ground).

2.  Furthermore, controlling precedent provides that a plaintiff need not apply for a license or other benefit to establish standing to challenge a policy governing issuance of that license or benefit where the plaintiff "makes a substantial showing that application for the benefit . . . would have been futile." *Ellison v. Connor*, 153 F.3d 247, 255 (5th Cir. 1998) (citation omitted) (holding that plaintiffs did not need to apply for building permits to establish standing where the defendant had already "specifically stat[ed] that it would not permit the construction or placement of any structures on their land").  This rule has particular force where, as here, a challenged "policy's flat prohibition would render submission futile." *LeClerc v. Webb*, 419 F.3d 405, 413 (5th Cir. 2005); *see also id.* at 410-11, 413-14 (nonimmigrant aliens were not required to file applications to sit for the Louisiana bar to establish standing to challenge policy requiring that "every applicant for admission to the Bar . . . be a citizen of the United States or a resident alien thereof"); *Moore v. U.S. Dep't of Agriculture*, 993 F.2d 1222, 1222-23 & n.2 (5th Cir. 1993) (white farmers were not required to complete an application for a government loan to challenge policy limiting such loans to non-whites).

The Second Circuit has applied the same rule in a case analogous to this one, concluding that a Virginia resident was not required to apply for a New York handgun license to establish

standing to challenge a New York law barring issuance of such licenses to non-residents.  *Bach v. Pataki*, 408 F.3d 75, 76-77, 82-83 (2d Cir. 2005).  The court acknowledged that, "[i]n many cases, requiring litigants to actually apply for a license before challenging a licensing scheme prevent[s] courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Id*. at 82.  But this principle had no application where the plaintiff was *statutorily ineligible* for the license.  Requiring a formal application in such circumstances would be a pointless callisthenic: "[i]mposing a filing requirement would force [the plaintiff] to complete an application for which he is statutorily ineligible and to file it with an officer without authority to review it.  We will not require such a futile gesture as a prerequisite for adjudication in federal court."  *Id*. at 83 (quotation marks omitted); *see also id*. at 82-83 ("The State Police informed [the plaintiff] that he was statutorily ineligible for a carry license.  [He] had nothing to gain thereafter by completing and filing an application.").

It is beyond cavil that it would have been pointless for the NRA Members to apply for Texas CHLs.  The issuance of such permits to individuals under 21 who have not served in the Armed Forces is categorically prohibited by statute, *see* TEX. GOV'T CODE § 411.172(a)(2) & (g), and the State does not contend otherwise.  Indeed, Texas has already told these NRA Members that they are ineligible for CHLs.  *See* Pls. SJ App. 6 (Harmon Decl. ¶ 12); Pls. SJ App. 11 (Jennings Decl. ¶ 13); Pls. SJ App. 17 (Payne Decl. ¶ 11).  The undeniable futility of a formal application is sufficient to confer standing. *Cf. McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) (resolving challenge to laws barring both the possession of any firearm without a

registration certificate and also the issuance of registration certificates for handguns, without any consideration of whether plaintiffs had sought to register their handguns).[2]

3.  Furthermore, the NRA Members took all of the steps that they could to apply for concealed-carry permits.  Each NRA Member: (1) completed the required "handgun safety course taught by a CHL instructor licensed by the Texas Department of Public Safety," (2) passed "the written and range tests that are given to applicants for a CHL," Pls. SJ App. 6 (Harmon Decl. ¶ 11); Pls. SJ App. 11 (Jennings Decl. ¶ 12); Pls. SJ App. 16 (Payne Decl. ¶ 10); and (3) filled out a CHL application.  *See* Pls. SJ App. 6 (Harmon Decl. ¶ 14); Pls. SJ App. 8 (completed Harmon form); Pls. SJ App.12 (Jennings Decl. ¶ 15); Pls. SJ App. 14 (completed Jennings form); Pls. SJ App. 17 (Payne Decl. ¶ 13); Pls. SJ App. 19 (completed Payne form). Texas law, however, "requires CHL applicants to submit an affidavit 'stating that the applicant . . . fulfills all the eligibility requirements' for obtaining a CHL, including the age requirement." Pls. SJ App. 6 (Harmon Decl. ¶ 13) (quoting TEX. GOV'T CODE § 411.174(a)(8)(B)); *accord* Pls. SJ App. 11 (Jennings Decl. ¶ 14); Pls. SJ App.17 (Payne Decl. ¶ 12).  Solely because the NRA Members could not truthfully state that they satisfied the age requirement, they were unable to complete the application process.

Under these circumstances, the NRA Members should be deemed to have applied for concealed carry permits, and the State should be deemed to have denied their applications.  The D.C. Circuit's recent decision in *Dearth* provides guidance here.  *Dearth* held that a U.S. citizen

---

[2] *Williams v. Maryland*, 10 A.3d 1167 (Md. 2011), is not to the contrary.  In that case there was no indication that it would have been futile for the plaintiff to apply for a carry permit. The plaintiff did not challenge any particular provision of the licensing scheme that would have categorically barred him from obtaining a permit, and the State introduced evidence showing "that nearly 93 percent of handgun permit applicants from 2006 to 2009 were issued permits." *Id*. at 1173 n.7; *cf. Osterweil v. Edmonson*, No. 10-31090, 2011 WL 1758770 (5th Cir. May 5, 2011) (denying standing to individual who failed to apply for a concealed handgun permit where there was no indication that application would have been futile).

living in Canada had standing to challenge provisions of federal law that "make it impossible for a person who lives outside the United States lawfully to purchase a firearm in the United States." 2011 WL 1437379 at *2.  The plaintiff was unable to complete the paperwork required to purchase a firearm because it required him to list his State of residence.  *Id.* at *1-2.  The D.C. Circuit rejected the argument that the plaintiff lacked standing because he could not complete the required paperwork and the Government therefore "did not affirmatively deny [his] application to purchase a firearm."  *Id.* at *2.  The "Government cannot so easily avoid suit when it has erected a regulatory scheme that precludes [the plaintiff] from truthfully completing the application form the Government requires for the purchase of a firearm."  *Id.*   Thus "the Government ha[d] denied [the plaintiff] the ability to purchase a firearm and he thereby suffer[ed] an ongoing injury"—and that injury was indistinguishable from that of a plaintiff who had been formally denied a registration certificate to possess a handgun.  *Id.*[3]

---

[3] Because the NRA Members continue to suffer ongoing injury from their inability to obtain concealed-carry permits, it is unnecessary to determine whether they have alleged a threat of criminal prosecution sufficient to establish pre-enforcement standing.  *See Dearth*, 2011 WL 1437379 at *4 n.*.  Because the NRA Members here must choose between foregoing their constitutional right to carry a firearm and facing criminal prosecution, however, there can be little doubt that they satisfy the requirements for pre-enforcement standing.  *See, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, 'he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.' "); *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2717 (2010); *International Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 817-19 (5th Cir. 1979) (quotation marks omitted).  The Ninth Circuit's decision in *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996), is not to the contrary.  That case pre-dated *Heller* and rested on the since-discredited view that "the Second Amendment is a right held by the states, and does not protect the possession of a weapon by a private citizen." *Id.* at 1124.  It was only because the plaintiffs "could show no legal injury" under the erroneous collective rights view that the court held they lacked standing to assert a Second Amendment challenge. *See id.* at 1124–25.

###### B.        The NRA Has Standing.

The NRA has associational standing to sue on behalf of its 18-to-20-year-old members who cannot obtain CHLs because of Texas' age restriction.  The State erroneously contends that the NRA fails to meet the third requirement for associational standing—that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).[4]  This requirement is not of "constitutional magnitude," but rather is a "judicially self-imposed" limitation on representational standing that focuses on "administrative convenience and efficiency."  *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 554, 557 (1996) (quotation marks omitted).  Courts therefore evaluate it by conducting a "prudential inquiry" into whether the asserted claims and requested relief will "support judicially efficient management if associational standing is granted."  *Association of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 551, 552-53 (5th Cir. 2010).  An analysis of the claims asserted and relief requested demonstrates that associational standing is appropriate in this case.

1. The NRA asserts two claims on behalf of its non-military, 18-to-20-year-old members from Texas:  (1) that Texas violates their Second (and Fourteenth) Amendment rights by prohibiting them from carrying handguns outside of their homes or automobiles, *see* Tex. Penal Code § 46.02, and (2) that Texas violates their Equal Protection rights by prohibiting them from applying for and obtaining a CHL that would exempt them from the State's handgun carriage

---

[4] The State also contends that the NRA fails to meet the first requirement for associational standing—that "its members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343.  This contention, however, is based on the State's argument that the NRA Members lack standing, an argument we have refuted.

The State does not dispute that the interests the NRA seeks to protect in this litigation are "germane to the organization's purpose," the second requirement for associational standing. *Id.* At any rate, as "America's foremost and oldest defender of Second Amendment rights," Pls. SJ App. 1 (Marcario Decl. ¶ 3), the NRA plainly satisfies this requirement.

ban, while permitting 18-to-20-year-old members of the military and veterans and Texans 21 and older to apply for and obtain CHLs, *see* TEX. PENAL CODE § 46.15, TEX. GOV'T CODE §§ 411.172(a)(2), (a)(9), & (g).  Because these asserted denials of 18-to-20-year-olds' constitutional rights flow directly from operation of Texas law, the issue in this case is not whether the State engages in the challenged conduct, but rather whether that conduct can be squared with the Constitution.  The analysis required to decide the NRA's claims is legal, not factual, and will require little active participation by NRA members.

Indeed, the propriety of the NRA's bringing these claims on behalf of its members is established by *Texas Medical Board*, the only Fifth Circuit case the State cites on this issue. 627 F.3d 547.  There, the Fifth Circuit *reversed* a district court decision holding that the Association of American Physicians and Surgeons (AAPS) lacked standing to sue the Texas Medical Board on behalf of its members for "pervasive and continuing violations of members' constitutional rights"—violations that would require the AAPS to introduce "evidence … from a small but significant sample of physicians" to prove.  *Id*. at 549, 553.[5]  Participation by individual physicians did not interfere with AAPS's standing, however, because "if practiced systematically, [the alleged] abuses may have violated or chilled AAPS members' constitutional rights."  *Id*. at 552, 553.[6]  Here there is no question that Texas law systematically prohibits all

---

[5] *See id*. at 549-50 (The AAPS alleged, among other things, that the Board "arbitrarily rejected a decision in favor of a doctor by an administrative law judge … and then issued a sanction that damaged the physician's reputation," "that the Board ha[d] retaliated against physicians who ha[d] complained about the Board," and that a member of the Board "targeted physicians using anonymous complaints filed by her husband.").

[6] *See also id*. at 552 (explaining that other circuits have concluded that "as long as resolution of the claims benefits the association's members and the claims can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry, the participation of those individual members will not thwart associational standing"); *id*. ("We can discern no indication … that the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an

18-to-20-year-olds who are not in the military or veterans from carrying a handgun outside of the home or automobile; therefore under *Texas Medical Board* there is no doubt that the NRA has standing to bring its claims on behalf of its 18-to-20-year-old members.[7]

2.  The NRA seeks a declaration that the challenged laws violate the Second (and Fourteenth) Amendment and the Equal Protection Clause and an injunction prohibiting Texas officials from enforcing those laws to deny otherwise qualified 18-to-20-year-olds the right to carry a handgun.  *See* Doc. 20, Amended Complaint ¶¶ 36-38; Doc. 44-1, Proposed Second Amended Complaint ¶¶ 58-60.  As the State's own cases make clear, such is the paradigm of relief that membership organizations seek on behalf of their members.  *See Hunt*, 432 U.S. at 343 ("Whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought.  If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.") (quotation marks and brackets omitted); *Texas Med. Bd.*, 627 F.3d at 553 ("Because AAPS … seeks only equitable relief from these alleged violations, [the] relief appear[s] to support judicially efficient management if associational standing is granted.").

---

association.  Such a stringent limitation on representational standing cannot be squared with the Court's assessment … of the efficiencies for both the litigant and the judicial system from the use of representational standing.") (quoting *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 601-02 (7th Cir. 1993)).

[7] *Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591 (2d Cir. 1993), is the only case cited by the State that rejects associational standing on account of the level of participation required by individual members, and it does nothing to undercut the NRA's standing.  Indeed, that case is "easily distinguishable from cases in which associations do have standing," *id.* at 596, such as this one, because of the extensive individual-member involvement that would have been required to prove the *as-applied* Takings Clause and substantive due process claims the plaintiff association brought against New York City's rent control scheme.  Resolving the claims would have required the court to "engage in an *ad hoc* factual inquiry for *each*" member alleging a constitutional violation, including analyzing "a host of individualized financial data."  *Id.* at 596-97 (emphasis in original).  Nothing of the sort is required here.

The fact that "the decision to grant or deny a CHL application rests on specific, individualized information, and requires a factual inquiry for each applicant" does not change this analysis. Texas SJ Br. 10. The NRA does not seek an injunction requiring the State to issue a CHL to every 18-to-20-year-old, but only an injunction prohibiting it from denying *otherwise qualified* 18-to-20-year-olds the right to carry a handgun solely on account of their age. No individual analysis of NRA members' circumstances is required to provide this relief, and the NRA is not challenging any other aspect of Texas' CHL scheme in this litigation.

Indeed, by focusing on other CHL eligibility requirements, the State, like the defendants and lower court in *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274, 287 (1986), simply "misconstrue[s] the nature of [the] claims" for relief. In *Brock*, the Supreme Court reversed the D.C. Circuit's decision that a union lacked standing to challenge, on behalf of its members, a federal agency's statutory construction of eligibility requirements for benefits for workers who lost their jobs because of competition from imports:

> [T]he relief requested … leaves any questions regarding the eligibility of individual [benefits] claimants to the state authorities given jurisdiction over such questions …. Thus, though the unique facts of each UAW member's claim will have to be considered by the proper state authorities before any member will be able to receive the benefits allegedly due him, the UAW can litigate this case without the participation of those individual claimants and still ensure that the remedy, if granted, will inure to the benefit of those members of the association actually injured.

*Id*. at 287-88 (quotation marks omitted). Similar reasoning applies here: if the NRA prevails, the age restriction prohibiting its non-military 18-to-20-year-old members from carrying a handgun will be removed. Whether any particular member is otherwise qualified to exercise this right, of course, "will have to be considered by the proper state authorities," but it nevertheless

remains the case that "the remedy, if granted, will inure to the benefit of those [NRA] members … actually injured" by Texas' ban on 18-to-20-year-olds carrying handguns. *See id* at 288.

*Heller* further demonstrates that the CHL eligibility requirements other than the age limitation challenged here do not stand in the way of NRA members' (and thus the NRA's) standing. There the Supreme Court ruled that Washington, D.C. violated the Second Amendment by banning the possession of operable handguns in the home. The Court issued that ruling without determining whether Heller met every requirement of the District's firearms-licensing regime: "*Assuming* that Heller is not disqualified from the exercise of Second Amendment rights," the Court held, "the District must permit him to register his handgun and must issue him a license to carry it in the home." *Heller*, 554 U.S. at 635 (emphasis added); *see also id.* at 631 ("petitioners have stated that 'if the handgun ban is struck down and respondent registers a handgun, he could obtain a license, *assuming he is not otherwise disqualified*,' by which they apparently mean if he is not a felon and is not insane") (emphasis added). By making this assumption, the Court indicated that Heller's standing to challenge the handgun ban did not require a demonstration that he fulfilled every requirement of the District's firearms licensing system. NRA members' standing to challenge the age limitation at issue here likewise does not depend upon a showing that they fulfill every other requirement the State imposes for obtaining a CHL.

## II. THE CONSTITUTION PROTECTS THE RIGHT TO BEAR ARMS OF LAW-ABIDING CITIZENS BETWEEN AGES 18 AND 21.

Our summary judgment brief conducted the textual and historical analysis employed in *Heller* to show that the constitutional right to keep and bear arms extends to individuals between the ages of 18 and 21. *See* Pls. SJ Br. 9-18. Indeed, both the text of the Constitution and founding-era evidence conclusively demonstrate that 18-to-20-year-olds fall within the core of

the constitutional arms-bearing right.  *See id.*  And the State of Texas itself has insisted that a

primary purpose of the Second Amendment was to ensure the ability of the citizenry, and in

particular those "between the ages of *eighteen* to forty-five," to "defend[] its rights by force."

Brief of the State of Texas, *et al.* as *Amici Curiae* in Support of Respondent at 14-15, *District of*

*Columbia v. Heller*, No. 07-290 (U.S. Feb. 2008) (Texas *Heller* Br.) (emphasis added).  Against

this backdrop, Texas' argument that "nothing in the Fourteenth Amendment deprives Texas of its

power to set a 21-year-old age of majority for obtaining a concealed-handgun license" is

unpersuasive.  Texas SJ Br. 16.

 1.  At the outset, Texas makes two fundamental concessions of great significance.  First,

Texas emphatically rejects the "intermediate scrutiny" applied by many lower courts in the wake

of *Heller:*

> The widely held notion that firearms regulations should trigger mere
> "intermediate scrutiny," while laws affecting free speech . . . and court-created
> "substantive due process" rights receive strict scrutiny, is not defensible and
> should be emphatically rejected by this Court.  Federal courts have no authority to
> create favored and disfavored classes of constitutional rights, and *now that*
> *McDonald has recognized the individual right to keep and bear arms as a*
> *"fundamental" constitutional right, it must be enforced with the same rigor that*
> *courts apply to the other fundamental rights established in the Constitution.*

*Id*. at 24 (emphasis added).  Since *Heller* and *McDonald* both rejected rational-basis scrutiny, the

only tier left – if one feels bound to apply such tiers – is strict scrutiny.  Plaintiffs continue to

believe that *Heller*'s own historical and textual approach is the proper means of resolving this

case, but strict scrutiny generates the same outcome:  the invalidation of the challenged Texas

law.

 2.  Second, Texas does not deny that the Second Amendment protects the right to bear

arms, including handguns, in public places for purposes of self-defense.  Texas implicitly

concedes that this is a constitutional right, and objects only that "the Constitution permits States

to limit certain constitutional rights to persons over the age of 21." Texas SJ Br. 1. *See also id.*
at 11, 13, 15, 17. Texas' acknowledgement of the fundamental right to carry a handgun for self-
defense in public is consistent with the position Texas took in *McDonald v. City of Chicago*,
where Texas argued – quite correctly – that "a statute that forbade openly carrying a pistol
'publicly or privately, without regard to time, place or circumstances,' . . . would be clearly
unconstitutional." Brief of the State of Texas, *et al.* as *Amici Curiae* in Support of Petitioners at
26, *McDonald v. City of Chicago*, No. 08-1521 (U.S. Nov. 2009) (Texas *McDonald* Br.).[8] The
challenged law imposes just such a carriage ban on law-abiding, adult Texans under 21, barring
them from carrying handguns for self-defense outside the home or automobile without regard to
time, place, or circumstances.

Elsewhere in its brief, Texas hedges, suggesting that it is "not entirely clear whether the
right to carry a concealed weapon is even included in the meaning of the right 'to keep and bear
arms' described in the Second Amendment." Texas SJ Br. 21. But this case is not about the
right to carry a *concealed* weapon, it is about the right to carry a weapon *at all*. And the
historical evidence amassed in our initial brief documents that it *is* entirely clear that such a right
is included in the meaning of the Second Amendment's right to keep and bear arms, Pls. SJ Br.
18-32, and Texas offers nothing to rebut that evidence. Instead, Texas attacks the idea of a right
to concealed carry, a right that is simply not at issue here. Furthermore, its principal authority on
the matter is a single phrase plucked from a case decided a hundred years before *Heller* – a case
that did not even present a Second Amendment issue, but instead concerned government
authority to return deserting sailors to their vessels. *See Robertson v. Baldwin*, 165 U.S. 275,

---

[8] In the quoted passage, Texas was characterizing a 19th century state court decision that
struck down a ban on openly carrying a pistol. *See Andrews v. State*, 50 Tenn. 165, 187 (1871).
Texas thus relies on the same precedents that plaintiffs have cited to this Court. Pls. SJ Br. 31-
32.

275, 281-82 (1897).  Also of little moment are the more recent cases Texas cites that "have questioned whether concealed carry regulations implicate the Second Amendment,"  Texas SJ Br. 21-22 n.8, for, as we have already explained, 18th and 19th century precedents distinguished between concealed carry, which was sometimes understood as importing a nefarious purpose and therefore outlawed, and open carry, which was every citizen's right.[9]  Thus the Louisiana Court of Appeals held that a state ban on carrying concealed firearms "interfere[d] with no man's right to carry arms (to use its words) 'in full open view,' which places men upon equality. This is the right guaranteed by the Constitution of the United States." *State v. Chandler*, 5 La. Ann. 489, 490 (1850).  *See also Bliss v. Commonwealth of Kentucky*, 12 Ky. 90, 91 (1822) ("for though the citizens are forbid [*sic*] wearing weapons concealed in the manner described in the act, they may, nevertheless, bear arms in any other admissible form.").  Plaintiffs here assert no right to carry a handgun in a particular manner, *i.e.*, concealed rather than openly, *see* Pl. SJ Br. 31; therefore all of Texas' authorities about concealed carry distinguish themselves.[10]

---

[9] A few of the cases Texas cites suggest that Second Amendment rights simply do not extend beyond the home.  *See Gonzalez v. Village of W. Milwaukee*, No. 09CV0384, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010); *Williams v. State*, 417 Md. 479, 496 (2011); *People v. Dawson*, 934 N.E.2d 598, 607 (Ill. App. Ct. 2010).  But Texas does not make this argument, and for good reason:  as we explained in our opening brief, *see* Pls. SJ Br. 18-32, and as we elaborate below, such a view is utterly inconsistent with the Second Amendment's text and with historical practice.  Indeed, such an implausibly narrow interpretation of the right to bear arms would plainly run afoul of Texas' own admonition that Second Amendment rights "be enforced with … rigor" and not be "relegate[ed] … to second-class citizenship."  Texas SJ Br. 24, 25.

[10] At one point, Texas characterizes the right to bear arms in public places as a claim of substantive due process and objects that plaintiffs are demanding creation of a "new" right that is not "deeply rooted in this Nation's history and tradition."  Texas SJ Br. 22.  But the Second Amendment is not "new" and, unlike the various privacy rights at issue in the cases Texas cites, the right to bear arms is *enumerated* in the Constitution's text.  As the Supreme Court held in *McDonald*, the right in question is the fundamental right of armed self-defense in case of confrontation, and "*Heller* makes it clear that this right is 'deeply rooted in this Nation's history and tradition.' " 130 S. Ct. at 3036.

13

3.   Texas' reluctance to contest the proposition that the Second Amendment embraces a right to carry a firearm in public is no doubt driven by the fact that *Heller* plainly contemplates that the right to self-defense extends outside the home.  As the Supreme Court explained, "the natural meaning of 'bear arms' " is to "be[] armed *and ready* for offensive or defensive action in a case of conflict with another person."  *Heller*, 554 U.S. at 584 (emphasis added; internal quotation marks omitted).  Therefore the Second Amendment "guarantee[s] the individual right to possess and carry weapons *in case of confrontation.*" *Id*. at 592 (emphasis added).  For example, when the Court searched in vain for past restrictions as severe as the District of Columbia's handgun ban, it deemed restrictions that applied *outside* the home most analogous, and noted with approval that "some of those [restrictions] have been struck down." *Id.* at 629 (citing *Nunn v. State*, 1 Ga. 243, 251 (1846) (striking down prohibition on carrying pistols openly), and *Andrews v. State*, 50 Tenn. 165, 187 (1871) (same)).  Such laws could hardly be analogous to D.C.'s invalid law or represent "severe" restrictions on the right to self-defense, *id.* at 629, if the Second Amendment's "core" right of armed self-defense were limited to the home. The same inference follows ineluctably from the Supreme Court's suggestion that laws forbidding firearms in "schools and government buildings" are "presumptively lawful." *Id.* at 626-27 & n.26.  The Court would have had no need to single out such "sensitive places," *id.* at 626, if *all* restrictions on the right to bear arms outside the home were subject to a less rigorous constitutional analysis.  Finally, the *McDonald* plurality's explanation that the Court's "central holding in *Heller*" was that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," 130 S. Ct. at 3044, would be incoherent if the right to bear arms is limited to the home.

14

4.  Texas' emphasis on the content of the *Fourteenth* Amendment, to the exclusion of the Second, is deliberate.  According to the State, "[t]o ask whether 'the Second Amendment' protects the rights of 18-year-olds to carry concealed handguns is besides the point," because "[t]he State laws in this case implicate not the Second Amendment, but the Fourteenth Amendment's right to bear arms that the Supreme Court recognized in *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)."  Texas SJ Br. 10-11.  But the Fourteenth Amendment right to bear arms that the Supreme Court recognized in *McDonald is* the right protected by the Second Amendment:  "we hold," the Court explained, "that the *Second Amendment right* is *fully applicable* to the States."  *McDonald*, 130 S. Ct. at 3025 (emphasis added); *see also id.* at 3058 (Thomas, J., concurring in part and concurring in the judgment) (same).  Indeed, the Court emphasized that it had long "abandoned the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights" and that, absent *stare decisis* considerations to the contrary, "incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment."  *Id*. at 3035 (quotation marks omitted).

All of this should be familiar to the State of Texas, for the *McDonald* Court was simply following the State's lead:  "the *Second Amendment's* right to arms," Texas had argued, "applies to the States through" the Fourteenth Amendment. Texas *McDonald* Br. 24 (emphasis added).  Indeed, Texas itself ridiculed respondent Chicago's "piecemeal approach to incorporation," which would have asked whether a particular firearm, or particular place for carrying a firearm, was "incorporated" by the Fourteenth Amendment.  *Id*. at 24-25.  The question presented, Texas

15

rightly pointed out, was "whether the Second Amendment *in its entirety* … applies to state and local governments." *Id*. at 25 (emphasis added).

Because it is the *Second Amendment* right to bear arms that the Fourteenth Amendment incorporates against the States, the scope of the Second Amendment right is not only relevant to, but is dispositive of, this case.  And to determine that scope (as opposed to determining whether or not the right is a fundamental one for incorporation purposes), this Court should look to the framing of the Bill of Rights, not the Fourteenth Amendment, because "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634-35.

5.  Despite all this, Texas' statement that "[t]o ask whether 'the Second Amendment' protects the rights of 18-year-olds to carry concealed handguns is beside the point," is, in a narrow sense, true.  Texas SJ Br. 11.  This case, as we have already explained, is not about a constitutional right to carry *concealed* handguns, but rather is about a constitutional right to carry handguns *at all*.  Texas does not merely ban non-military 18-to-20-year-olds from carrying concealed handguns, it bans them from carrying handguns openly *or* concealed outside of the home or automobile.  *See* Tex. Penal Code § 46.02.  And as Texas itself has recognized, laws that ban both open and concealed carry of handguns are among the "few laws in the history of our Nation [that] have come close to the severe restriction of the type of handgun ban enacted by the District of Columbia and Chicago" that the Supreme Court struck down in *Heller* and *McDonald*, respectively.  Texas *McDonald* Br. 26 (quotation marks omitted).

6.  Texas nevertheless argues that its carriage restriction is constitutionally permissible because "[t]he States have long enjoyed the prerogative to set different ages of majority for different purposes."  Texas SJ Br. 15.  In Texas' view, in other words, the Constitution permits

16

States to set an "age of majority" of 21 for exercising Second Amendment rights.  But the State's reasoning is not limited to the Second Amendment:  according to Texas, "*[e]very* provision in the Bill of Rights… was enacted against [a] common-law backdrop that both limited the rights of privileges of persons under the age of 21 and allowed the States to treat them as infants." *Id*. at 13 (emphasis added).  The logical conclusion of Texas' argument is that the States are free to exclude 18-to-20-year-olds from the exercise of *all* fundamental rights enumerated in the Bill of Rights.

This sweeping argument is plagued by multiple fatal flaws.  First, Texas labors under the misapprehension that this is some sort of federalism case involving the preemption of state age-of-majority laws by a federal statute.  Thus Texas argues that "[t]he federal government lacks Article I power even to regulate the mere possession of firearms, let alone establish a nationwide minimum age for concealed-handgun licenses."  Texas SJ Br. 11 (citing Commerce Clause decisions).  But what "preempts" Texas law here is not a statute enacted by Congress, but the Second and Fourteenth Amendments to the Constitution.  Any issues of state prerogatives or reserved powers were resolved by the States' own ratification of the Fourteenth Amendment.  Thus, as Texas itself pointed out in *McDonald*, " 'to deny to the States the power to impair a fundamental constitutional right is not to increase federal power, but, rather to limit the power of both federal and state governments in favor of safeguarding the fundamental rights and liberties of the individual.' "  Texas *McDonald* Br. 24 (quoting *Pointer v. Texas*, 380 U.S. 400, 413-14 (1965) (Goldberg, J., concurring)); *see also id.* at 22 (state legislative discretion to experiment

with different policies "does not include 'the power to experiment with the fundamental liberties of citizens safeguarded by the Bill of Rights.' ") (quoting *Pointer*, 380 U.S. at 413).[11]

Secondly, as we explained in our summary judgment brief, although the common-law age of majority was 21, restrictions on keeping and bearing arms were not one of the disabilities associated with minority status at the time the Second Amendment was ratified.  *See* Pls. SJ Br. 14-15.  Indeed, 18-to-20-year-old minors of the founding generation not only were permitted but were *required* to keep and bear arms.  *See id.* at 9-13; *see also* Militia Act of 1792, 1 Stat. 271.[12] The common-law age of majority, in other words, did not restrict 18-to-20-year-olds' right to keep and bear arms.  Furthermore, Texas law expressly provides that "[t]he age of majority in this state is 18 years."  TEX. CIV. PRAC. & REM. CODE § 129.001.  In the limited instances in which the legislature has established a different age of majority for a particular purpose, it has said so.  *See, e.g.,* TEX. ALCOHOLIC BEVERAGE CODE § 106.01 ("In this code, 'minor' means a person under 21 years of age.").  While Texas law establishes 21 as the minimum age for civilians to obtain a CHL, the law does not purport to establish this as an "age of majority."

At any rate, Texas' argument that it is free to establish 21 as an "age of majority" for the exercise of fundamental rights protected by the Bill of Rights is simply wrong.  As explained in

---

[11] In *McDonald*, Chicago, like Texas here, argued that application of the Second Amendment would constitute a significant federal intrusion into traditional areas of state concern, but this argument found favor only with the Court's dissenters.  *See* 130 S. Ct. at 3049 (rejecting federalism argument raised by the dissent).

[12] Texas asserts that the Militia Act of 1792 "suggests only that *military personnel* aged 18 or older should fully enjoy all privileges related to the right to keep and bear arms."  Texas SJ Br. 13 (original emphasis).  Texas confuses the military with the militia.  In organizing the federal militia, Congress was, as *Heller* pointed out, drawing from the pool of individuals *already* understood to possess the right to keep and bear arms – that is, "all citizens *capable* of military service." *Heller,* 554 U.S. at 627 (emphasis added); *see also id.* at 596 ("Although the militia consists of all able-bodied men, the federally organized militia may consist of a *subset* of them.") (emphasis added).  By including 18-to-20-year-olds in the federal militia, the Militia Act of 1792 thus provides compelling evidence that individuals in that age group were presumptively deemed capable of military service and thus at the core of the Second Amendment's protection.

the next paragraph, that proposition would overturn a host of precedents that struck down state restrictions on the rights of those under 21.  Indeed, the authority Texas cites for the proposition that it has the prerogative to set different ages of majority for different purposes itself recognizes that "the legislature has the power to fix or change the age at which persons reach majority or at which infants are deemed competent to perform certain acts or duties" only "*in the absence* of an express constitutional inhibition."  42 AM. JUR. 2D INFANTS § 6 (emphasis added, footnotes omitted); *see also Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 74 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority.  Minors, as well as adults, are protected by the Constitution and possess constitutional rights.").  And, as we have demonstrated, the "express constitutional inhibition" against infringing the right to keep and bear arms extends fully to 18-to-20-year-olds.

7.   Contrary to Texas' suggestion, to prevail here plaintiffs need not establish that "18 years [is] the minimum age for [exercising *all*] constitutional rights."  Texas SJ Br. 13.  It is enough to show that at 18 individuals are protected by the *Second Amendment* right to keep and bear arms.  It is nevertheless instructive that the Supreme Court has repeatedly vindicated the constitutional rights of individuals under 21 years of age,[13] and has done so even in the context of *unenumerated* rights.[14]  To be sure, the Court has held that, in certain circumstances, "the State has somewhat broader authority to regulate the activities of children than of adults,"

---

[13] *See, e.g.*, *Brown v. Board of Educ.*, 347 U.S. 483 (1954) (equal protection); *In re Gault*, 387 U.S. 1 (1967) (right to notice of charges, right to counsel, privilege against self-incrimination, and right to confront witnesses); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (free speech); *Cohen v. California*, 403 U.S. 15 (1971) (same); RICHARD C. CORTNER, THE SUPREME COURT AND CIVIL LIBERTIES POLICY 123 (1975) (Cohen was 19 years old at the time of his arrest); *Roper v. Simmons*, 543 U.S. 551 (2005) (cruel and unusual punishment); *Safford Unified Sch. Dist. # 1 v. Redding*, 129 S. Ct. 2633 (2009) (unreasonable searches and seizures).

[14] *See, e.g.*, *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) (birth control); *Danforth*, 428 U.S. 52 (abortion).

*Danforth*, 428 U.S. at 74, but the cases in which the Court has put that principle into practice involved children under 18, *see, e.g.,* Pls. SJ Br. 15 n.7, not adults 18 and over as in the present case.  Indeed, we are not aware of any fundamental right protected by the Bill of Rights that the Supreme Court has held does not fully mature by age 18.  And unless the Court abandons its directive that the Second Amendment is not to be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald*, 130 S. Ct. at 3044 (plurality), the Second Amendment right cannot be the first.

8.  Unable to muster any historical evidence or precedent for the proposition that States are free to strip 18-to-20-year-olds of the right to bear arms, Texas turns to other contexts in which the States and the federal government have placed restrictions on 18-to-20-year-olds on account of their age.  *See* Texas SJ Br. 14 & n.2.  But these examples fail to advance Texas' cause.

As an initial matter, the government's authority to allocate immigration visas and to establish eligibility for child support has no bearing on the government's authority to restrict the exercise of fundamental rights protected by the Bill of Rights.  *See Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens") (quotation marks omitted); *Brinkley v. Hill*, 981 F. Supp. 423, 442 (S.D. W. Va. 1997) ("there is no fundamental right to child support").

The State's remaining cases address age requirements for voting, jury service, and eligibility for public office.  But as both an historical and legal matter, treatment of these subjects cuts *against* a finding that Second Amendment rights may be confined to those 21 and older.

With respect to voting, the Constitution provides that "[t]he right of citizens of the United States, who are *eighteen* years of age or older, to vote shall not be denied or abridged by the

20

United States or by any State on account of age." U.S. CONST. amend. XXVI, § 1 (emphasis added). And given that extension of voting rights to a group recognizes in its members "the intelligence and the freedom of will essential to the proper exercise of the right," THOMAS COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS 29 (1868), to the extent it is relevant the constitutionally prescribed voting age of 18 weighs strongly in favor of treating 18-year-olds as adults for purposes of other constitutional rights. Indeed, the voting age was one of the factors the Supreme Court considered in holding that the line be drawn at age 18 for purposes of death penalty eligibility under the Eighth Amendment. *See Roper v. Simmons*, 543 U.S. 551, 569 (2005).

The fact that it took a constitutional amendment to lower the voting age in the States from 21 to 18 likewise supports plaintiffs, not Texas. Before ratification of the Twenty-Sixth Amendment, our Nation's historical practices strongly supported 21 as the minimum voting age. *See* ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES 277 (2000) ("Since the nation's founding, a voting age of twenty-one … had been a remarkable constant in state laws governing the franchise."); Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*, 71 U. CIN. L. REV. 1345, 1358 (2003) ("In 1943, Georgia became the first state to lower its voting age to 18.").[15] It is thus not surprising that a constitutional amendment was required to protect 18-to-20-year-olds' voting rights. Unlike voting rights, however, the founding generation understood the right to bear arms

---

[15]   *See also* DEL. CONST. art. IV, § 1 (1792), *in* 1 THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS 574 (F. Thorpe ed. 1909) (establishing minimum voting age of 21); GA. CONST. art. IX (1777), *in* 2 *id.* at 779 (same); KY. CONST. art. III, § 1 (1792); *in* 3 *id.* at 1269 (same); MD. CONST. art. II (1776), *in* 3 *id.* at 1691 (same); MASS. CONST. pt. 2, ch. I, § 3, art. IV  (1780), *in* 3 *id.* at 1898 (same); N.H. CONST. pt. 2, § XXVIII (1792), *in* 4 *id.* at 2479 (same); N.C. CONST. art. VIII (1776), *in* 5 *id.* at 2790 (same); PA. CONST. § 6 (1776), *in* 5 *id.* at 3084 (same); S.C. CONST. art. I., § IV (1790), *in* 6 *id.* at 3258-59; TENN. CONST. art. III, § 1 (1796), *in* 6 *id.* at 3418 (same).

to extend fully to 18-to-20-year-olds.  *See* Pls. SJ Br. 9-15.  Given this historical understanding

and practice, a constitutional amendment would be required to *raise* the minimum age for full

Second Amendment protection from 18 to 21, just as in light of historical understanding and

practice in the voting rights context, a constitutional amendment was required to *lower* the

minimum voting age from 21 to 18.  *See Heller*, 554 U.S. at 634-35 ("Constitutional rights are

enshrined with the scope they were understood to have when the people adopted them.").[16]

With respect to jury service, like voting (and unlike arms bearing) founding-era practices

support a minimum age of 21.[17]  Indeed, jury eligibility was often linked to voting eligibility.[18]

Furthermore, "jury lists" are simply required to "reasonably reflect[] a crosssection of the

population suitable in character and intelligence for that civic duty."  *Carter v. Jury Comm'n of

Greene County*, 396 U.S. 320, 332-33 (1970).  And the very case the State cites for the

proposition that, consistent with this principle, 18-to-20-year-olds may be excluded from jury

service, cuts in *favor* of 18-to-20-year-olds' Second Amendment rights.  That case holds that

"persons aged eighteen to twenty are not an identifiable group the exclusion of which renders a

---

[16] Contrary to the State's suggestion, Section 2 of the Fourteenth Amendment, which penalizes states for abridging voting rights of male citizens 21 years of age or older, plainly does nothing to alter or restrict the scope of the right to keep and bear arms enshrined in the Constitution.  Indeed, it is the State, not plaintiffs, that "embrac[es] an unusual variant of living constitutionalism" by advancing this argument.  Texas SJ Br. 15.

[17] *See, e.g., An Act relative to juries and verdicts*, N.J. Session Laws 1797, ch. DCLXXIV, p. 250 ("[E]very petit juror … shall be … above the age of twenty-one ….").

[18] *See, e.g., An Act for Regulating the Choice and Services of Petit Jurors*, 1786, *in* 1 THE PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 186 (I. Thomas & E.T. Andrews, eds., 1801) (authorities "shall notify the freeholders and inhabitants in their towns, qualified to vote in the election of Representatives, to assemble and be present at the appointment of the Jurors"); *see also* ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 728 (J.P. Mayer ed., George Lawrence trans., 1969) ("In America all citizens who are electors [in general] have the right to be jurors."); *id.* at 273 ("The jury system as understood in America seems to me to be as direct and extreme a consequence of the … sovereignty of the people as universal suffrage. … [F]or society to be governed in a settled and uniform manner, it is essential that the jury lists should expand or shrink with the lists of voters.").

jury list nonrepresentative of the community," because "[t]he difference in viewpoint between ages eighteen to twenty and twenty-one to twenty-five, for example, *would not seem to us of any great significance*," and thus it would be "highly speculative whether the decisional outlook of such excluded persons would be different than that of persons a mere few years older." *United States v. Olson*, 473 F.2d 686, 688 (8th Cir. 1973) (emphasis added, quotation marks, brackets, and ellipses omitted).  To put it mildly, this language provides no support for subjecting 18-to-20-year-olds' right to bear arms to greater restrictions than those aged, say, "twenty-one to twenty-five." *Id.*

With respect to eligibility for office, "[t]here is no fundamental right to be a candidate." *Hatten v. Rains*, 854 F.2d 687, 693 (5th Cir. 1988).  Indeed, the Constitution itself has always set minimum ages for office of 25 (House of Representatives), 30 (Senate), and 35 (President).  *See* U.S. CONST. art. I, §§ 2-3, art. II, § 1.  If it were proper to draw an analogy between eligibility for office and the exercise of fundamental rights protected by the Bill of Rights, it would follow that the States could restrict the exercise of such rights for everyone under the age of 35.  There is, of course, absolutely no support for this striking proposition.[19]

---

[19] In addition, it bears noting that the political rights of voting, jury service, and eligibility for public office can be exercised only within the context of a functioning political system, and are thus distinct from rights, like the "natural right … self-preservation" protected by the Second Amendment, 1 BLACKSTONE COMMENTARIES *139, that exist wholly apart from political institutions.  *See* Vikram David Amar, *Jury Service as Political Participation Akin to Voting*, 80 CORNELL L. REV. 203, 259 (1995) ("Rights of political participation are logically and historically distinct from … individual freedoms from government intrusion.").  Particularly given the strong historical evidence that 18-to-20-year-olds enjoy the right to keep and bear arms, historical practices regarding these political rights therefore should not be used to constrict 18-to-20-year-olds' Second Amendment rights.

**III.    THE CHALLENGED STATUTE CANNOT SURVIVE SCRUTINY UNDER THE SECOND AMENDMENT.**

1.   As explained above and in our initial brief, application of the historical and textual analysis employed in *Heller* requires the invalidation of the Texas statutes challenged here and, just as in *Heller*, no excursion into the quagmire of tiers of scrutiny is necessary.  Pls. SJ Br. 7-8, 32-33.  But if such an approach were employed, only strict scrutiny would be appropriate for the laws challenged here, which deny the right to bear arms to law-abiding Texas adults under the age of 21.

Texas errs in asserting that the Fifth Circuit has rejected strict scrutiny as inappropriate under the Second Amendment.  Texas SJ Br. 24 (citing *United States v. Darrington*, 351 F.3d 632, 635 (5th Cir. 2003)).  *Darrington* merely upheld a statute barring possession of firearms by convicted felons, who have always been understood to be outside the ambit of the Second Amendment.  *See Darrington,* 351 F.3d at 635 (rejecting argument that "*a felon* has a 'fundamental' right to keep and bear arms, or that any governmental restrictions on *this* right must meet a constitutional strict scrutiny test," because "it is clear that felons may be prohibited from possessing firearms") (emphasis added, quotation marks, brackets, and ellipses omitted).  And since it decided *Darrington*, the Fifth Circuit has expressly recognized that it "need not decide whether the Second Amendment's boundaries are properly defined through strict scrutiny analysis" when adjudicating felons' firearms rights, thus indicating that the question remains an open one in the circuit.  *United States v. Everist*, 368 F.3d 517, 519 n.1 (5th Cir. 2004).

Furthermore, to the extent *Darrington* questions whether the right to keep and bear arms is a fundamental right on the same plane as other fundamental rights protected by the Bill of Rights, *see* 351 F.3d at 635, it cannot be squared with the Supreme Court's later decisions in *Heller* and *McDonald.*  It is beyond cavil that *Heller* and *McDonald* held that the right to bear

24

arms is fundamental, *see* Pls. SJ Br. 32-34 (collecting citations), and Texas itself argues at great

length that the Second Amendment enshrines a " 'fundamental' constitutional right [that] must

be enforced with the same rigor that courts apply to the other fundamental rights established in

the Constitution."  Texas SJ Br. 24.   As we have demonstrated, fundamental rights call for strict

scrutiny, at least where, as here, the challenged law infringes a law-abiding adult's core Second

Amendment right of armed self-defense. Pls. SJ Br. 33-35.  The burden of meeting that high

standard rests on Texas, and it has not even attempted to show that the challenged law survives

strict scrutiny.

    2.  Despite the calumny that it properly heaps on intermediate scrutiny, Texas SJ Br. 23-

25, Texas appears at times to flirt with the even less appropriate standard of reasonable-basis

scrutiny.  Thus Texas argues that the "Fourteenth Amendment permits States to set *reasonable,*

non-pretextual ages of majority for the exercise of constitutional rights, and … the 21-year-old

minimum-age requirement for a concealed handgun license satisfies this test."  Texas SJ Br. 25

(emphasis added).  *See also id.* at 1 (age 21 is "reasonable" minimum); *id*. at 17 (age 21

"represents an eminently reasonable line-drawing effort").  Yet in the same breath Texas

concedes that "*Heller* explicitly rejects the 'rational basis' test."  Texas SJ Br. 23.

    Indeed it did, and there is no meaningful distinction between "rational basis" scrutiny and

"reasonable regulation" scrutiny (which is also advocated here by Texas' *amicus curiae*, the

Brady Center).  In *Heller*, the Supreme Court was offered the "reasonable regulation" standard

that some state courts apply under their own constitutional provisions concerning firearms.  *See*

Brief of Law Professors Erwin Chemerinsky and Adam Winkler as *Amici Curiae* in Support of

Petitioner District of Columbia, in *Heller*, No. 07-290, at 7.  *See also* Adam Winkler,

*Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683 (2007).  Although the dissenters in

*Heller* favorably cited Professor Winkler's standard, *see* 554 U.S. at 691 (Breyer, J., dissenting), it was rejected by the Court.  Professor Winkler freely admits that the "reasonableness" standard is functionally equivalent to "rational basis" scrutiny:  "in ordinary practice both standards are extremely deferential.  Rational basis review has been characterized as 'virtually none in fact' because nearly every law subject to it survives judicial scrutiny.  Similarly, nearly all laws survive the reasonable regulation standard. … Like rational basis, the reasonable regulation standard tends to be, more than anything else, shorthand for broad judicial deference." Winkler, *supra*, 105 MICH. L. REV. at 718-19.  Indeed, Professor Winkler concedes that "[s]tate courts commonly use the rational basis and reasonable regulation language interchangeably." *Id.* at 718 n.198; *see also id.* at 686 n.12 (collecting cases).  This road is therefore plainly barred by *Heller*, which explicitly rejected application of any standard of review requiring mere reasonableness or rationality:  "Obviously, the [rational basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms…. If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." 554 U.S. at 628 n.27. *See also McDonald,* 130 S. Ct. at 3046 (rejecting proposition that Second Amendment requires firearms regulations merely to be "reasonable").

3.     As anticipated in our initial brief, Pls. SJ Br. 40-44, Texas defends the infringement of the Second Amendment rights of law-abiding adults under age 21 by pointing to the important public purpose of reducing crime.  Texas SJ Br. 17-18.  But the defense offered by Texas cannot survive even intermediate scrutiny.  Under that standard, Texas "must demonstrate an

'exceedingly persuasive justification' " for the challenged law and show that "the discriminatory means employed are substantially related" to the government objective. *United States v. Virginia*, 518 U.S. 515, 531, 533 (1996). The fit between means and end must survive "skeptical scrutiny," *id.* at 531, and the court is to determine whether the challenged regulation "is not more extensive than is necessary to serve that [state] interest." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 566 (1980).

    4. Texas contends that "individuals aged 18-20 commit a disturbingly high amount of gun crimes." Texas SJ Br. 17. As the Supreme Court observed in *McDonald*, the mere invocation of public safety is not enough to evade the Second Amendment, and the "right to keep and bear arms … is not the only constitutional right that has controversial public safety implications." 130 S. Ct. at 3045. Texas offers some crime statistics, but they all concern the use of "firearms" or "guns" in general, and do not identify what portion of these crimes involved handguns and what portion took place in public spaces rather than in homes or in vehicles. Texas SJ Br. 17-18. The Texas statute challenged here limits only the public carriage of handguns by those aged 18-20; Texas law does not forbid the use or possession of handguns by this age group, it does not forbid the carrying of handguns in vehicles or on one's own property by this age group, nor does it forbid the use, possession or even the carrying in public of rifles or shotguns by this age group. Thus Texas has failed to demonstrate a substantial connection between the challenged law and the public purpose that law is supposed to serve. A statute fails even intermediate scrutiny if it "provides only the most limited incremental support for the interest asserted." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 73 (1983). The fundamental right to keep and bear arms is "not to be rendered inapplicable by statistically measured but loose-fitting generalities." *Craig v. Boren*, 429 U.S. 190, 208-09 (1976).

If anything, the victimization statistics Texas cites demonstrate that denying law-abiding Texas adults under 21 the right to carry handguns for self-defense will *exacerbate* violent crime. Texas avers – and plaintiffs will stipulate – that (1) "[y]ounger persons, particularly those age 18-20, had higher rates of victimization by armed offenders," and (2) that "[t]hose aged 18 to 24 were 3.5 times as likely … to be killed with a firearm."  Texas SJ Br. 18.  Thus Texas law targets and disarms the very age group that Texas itself contends is at the greatest risk of gun violence from criminals. *See also* Pls. SJ Br. 43-44.  The challenged law thus subverts, rather than advances, the public-safety rationale on which Texas relies.   Denying handguns to the law-abiding adults who most need them for self-defense "cannot directly and materially advance [the state's] asserted interest" in reducing victimization by gun crime.  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488 (1995); *see* Pls. SJ Br. 43-44 (discussing defensive gun use research).[20]

5.  Texas next argues that it has to deny a CHL to everyone under the age of 21 because a different Texas law seals the criminal records for those under age 18, leaving the State with "only a limited record available" on which to perform a criminal background check for CHL applicants aged 18, 19 or 20.  Texas SJ Br. 18-19.  This is an obvious – and obviously insufficient – bootstrap: Texas would justify its violation of a fundamental, enumerated constitutional right with one statute in order to counteract the negative administrative consequences flowing from the sealing of juvenile criminal records in another statute.[21]  As the

---

[20] Thomas Jefferson's personal journal quoted Cesare Beccaria, "the father of criminology," dismissing restrictions on firearms as a "false utility" because, since only the law-abiding obey such laws, they "make things worse for the assaulted and better for the assailants." Only the law abiding obey – leaving criminals armed. *See* 4 THE COMMONPLACE BOOK OF THOMAS JEFFERSON: A REPERTORY OF HIS IDEAS ON GOVERNMENT 314 (Gilbert Chinard ed., 1926) (quoting CESARE BECCARIA, ON CRIMES AND PUNISHMENTS 87–88 (Henry Paolucci trans., 1963) (1764)).

[21] Furthermore, the statute governing the sealing of juvenile records (which Texas does not cite) does not apply automatically, *see* TEX. FAM. CODE § 58.003(a), and it offers no

State of Texas itself has recently argued in another case, "[t]he Constitution does not permit this type of blatant bootstrapping – create a problem [with one law] and then assert that it is necessary and proper to fix the problem by asserting an authority the Constitution otherwise denies."[22]  The proper way for Texas to serve the privacy interests of juvenile offenders without infringing the Second Amendment rights of 18-to-20-year-olds who have no criminal record is to condition a CHL application on the applicant's agreement to waive his or her privacy interests and permit the unsealing of any juvenile records exclusively for purposes of the CHL application process.[23]

      6.  Texas concedes that the vast majority of Texas adults under 21 are not prone to violence, but it pleads that "no government has the resources to determine on a case-by-case basis whether a minor or infant has the requisite maturity to vote, drive a car, or carry a concealed weapon." Texas SJ Br. 19-20.  *But Texas' assertion is demonstrably false because Texas law already investigates and issues all handgun-carry permits on an individual basis.*  In Texas' own words, "the decision to grant or deny a CHL application rests on specific,

protection at all to the worst offenses committed by 18-to-20-year-olds as juveniles, *see id.* § 58.003(c) ("a court may order the sealing of records concerning a person adjudicated as having engaged in delinquent conduct that violated a penal law of the grade of felony only if … the person is 21 years of age or older").

    [22] Brief of State of Texas by and through Greg Abbott, Attorney General, *et al.* at 40, *State of Florida, et al. v. United States Dep't of Health & Human Servs.,* No. 11-11021 (11th Cir. May 4, 2011).

    [23] Indeed, Texas *already* requires CHL applicants to make such a waiver.  *See* TEX. GOV'T CODE § 411.174(a)(9) (requiring CHL applicants to submit "a form executed by the applicant that authorizes the director to make an inquiry into any noncriminal history records that are necessary to determine the applicant's eligibility for a license under Section 411.172(a)"); TEX. FAM. CODE § 58.003(m) ("On request of the Department of Public Safety, a juvenile court shall reopen and allow the department to inspect the files and records of the juvenile court relating to an applicant for a license to carry a concealed handgun under Subchapter H, Chapter 411, Government Code."); *see also* Form CHL-85, Authorization For Release of Records Affidavit, *at* http://www.txdps.state.tx.us/InternetForms/Forms/CHL-85.pdf (authorizing release of information including "[f]iles and records of the juvenile court relating to applicant pursuant to Section 58.003(m), Texas Family Code").

individualized information and requires a factual inquiry for each applicant."  Texas SJ Br. 10.

Among the "numerous eligibility requirements" that are assessed by the State on an individual

basis, *id*. at 9,  is the requirement that the applicant must "[b]e capable of exercising sound

judgment with respect to the proper use and storage of a handgun." *Id*. at 3.  This is the

individualized CHL process that Texas *already* applies to every applicant over the age of 21; a

judgment for plaintiffs here would merely require Texas to extend this process to those aged 18

to 20.[24]

The Constitution requires nothing less.  When applying a classification that restricts

fundamental rights, the state "may not rely on 'overbroad' generalizations to make 'judgments

about people' " based on their membership in a group that is thought to have particular

characteristics or to present particular risks.  *United States v. Virginia*, 518 U.S. at 542.  Even

intermediate scrutiny does not tolerate "categorical exclusion, in total disregard of th[e]

individual merit" of a given individual. *Id*. at 546.  Individual merit (or individual

disqualification) for a CHL would be easily revealed by the very same individualized permit

process, including a determination of the ability to exercise "sound judgment with respect to the

proper use and storage of a handgun," that Texas already applies to every CHL applicant 21 and

older.   Separating the qualified from the unqualified is precisely what individual assessments are

for, and when a fundamental enumerated right is at stake, such assessment of individual merit is

required.[25]

---

[24] As it happens, Texas also has an elaborate regime for issuing driving permits to those aged 15-17, which likewise requires individualized showings of maturity, experience, training and driving proficiency.  *See* Tex. Transp. Code § 521.204 (driver's license); *id.* § 521.222 (instruction permit); *id.* § 521.223 (hardship license).

[25] In all events, if this Court deems it necessary to apply a levels of scrutiny analysis to resolve this case, that analysis does not implicate a "genuine dispute as to any material fact, Fed.

## IV.   THE CHALLENGED STATUTES DENY PLAINTIFFS THE EQUAL PROTECTION OF THE LAW.

1.   Texas urges this Court to apply mere rational-basis review to its ban on the carrying of handguns by adults under 21, on grounds that neither age nor military status is a suspect classification.  Texas SJ Br. 25-26.  But as we have already pointed out, strict scrutiny applies if the classification affects a fundamental right, Pls. SJ Br. 44, and Texas concedes that the right to bear arms is "fundamental." Texas SJ Br. 24-25 (citing *McDonald*).

2.   Texas contends that its categorical refusal to grant CHLs to law-abiding adults under age 21 "easily survives rational-basis review." Texas SJ Br. 26.  But as explained above, the standard is strict scrutiny, and the challenged law cannot survive even under intermediate scrutiny.

3.   Texas argues that discriminating between adults under 21 and those over 21 with respect to permits to carry a handgun is constitutionally permissible because Texas makes the same distinction with respect to purchasing alcohol.  Texas SJ Br. 26-27.  But there is no constitutional right to buy beer, whereas the right to bear arms is enumerated in the Second

---

R. CIV. P. 56(a), that would preclude entry of summary judgment for plaintiffs.  To the extent the analysis involves "factual" matters, such as crime statistics regarding 18-to-20-year-olds, those matters are classic examples of legislative facts, *i.e.*, broad facts that sweep beyond the adjudicative facts specifically concerning "the parties, their activities, their properties, their businesses."  FED. R. EVID. 201, 1972 ADVISORY COMMITTEE NOTE (quotation marks omitted).  It is both proper and preferable for this Court to resolve issues of legislative fact on the basis of the materials cited in briefing (as well as any others the Court may find through its own research). *See id.*; *Drummond v. Fulton County Dep't of Family & Children's Serv.*, 563 F.2d 1200, 1210-11 (5th Cir. 1977) ("Trials are seldom desirable either on legislative facts or on broad factual issues.") (quotation marks omitted); *Indiana H.B.R.R. Co. v. American Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990) ("[T]rials are to determine adjudicative facts rather than legislative facts."); *Daggett v. Commission on Governmental Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999) (" '[L]egislative facts' … usually are not proved through trial evidence but rather by material set forth in the briefs.").

Amendment.  Moreover, even some discrimination in alcohol purchasing has been struck down under the Equal Protection Clause.  Pls. SJ Br. 46.

4.  Finally, Texas argues that it is constitutional to allow current or former members of the military to carry handguns while denying that right to civilians, because a "rational legislature could … imagine" that the former "are more equipped to handle concealed handguns at ages 18, 19, and 20" due to their "extensive training in handling weapons."  Texas SJ Br. 27.

First, as previously explained, mere rationality is not the constitutional standard and Texas has not even tried to show that its classification could survive intermediate scrutiny, let alone strict scrutiny.  Heightened scrutiny mandates a tighter fit than that supplied by "imagination," and here that means individual consideration of the merits of CHL applicants.  Surely few members of the armed forces could match the pistol prowess of NRA Member Rebekah Jennings, with her national marksmanship titles, so Texas' musings about relative handgun proficiency cannot justify its blanket prohibition on issuing CHLs to civilian adults under age 21.

Second, although the distinction Texas draws between civilians and members of the military might be a *valid policy reason* for requiring the former, but not the latter, to take a training course, pass a test, or demonstrate proficiency with a handgun, it is *not a valid constitutional basis* for allowing only the former, and not the latter, to exercise the fundamental right to carry a handgun for self-defense.  Different training requirements for veterans and civilians are one thing; different constitutional rights are something else.  A principal purpose of both the Second Amendment and the Fourteenth Amendment was to " 'affirm the full and equal right of *every citizen* to self-defense,' " and to guarantee that the right of "the *people*" to bear

arms not become the exclusive privilege of the military, "the militia," or "local peace officers."

*McDonald*, 130 S. Ct. at 3041, 3043 (emphasis added).[26]

Dated June 6, 2011                    Respectfully submitted,


                                      s/ Charles J. Cooper
Fernando M. Bustos                    Charles J. Cooper*
State Bar No. 24001819                David H. Thompson*
LAW OFFICES OF FERNANDO M. BUSTOS,    Peter A. Patterson*
P.C.                                  COOPER & KIRK, PLLC
P.O. Box 1980                         1523 New Hampshire Ave., NW
Lubbock, TX 79408-1980                Washington, D.C.  20036
Tel: (806) 780-3976                   Tel: (202) 220-9600
Fax: (806) 780-3800                   Fax: (202) 220-9601
Email: fbustos@bustoslawfirm.com      Email: ccooper@cooperkirk.com

                                      Brian Koukoutchos*
                                      28 Eagle Trace
                                      Mandeville, LA 70471
                                      Tel:  (985) 626-5052
                                      Email:  bkoukoutchos@gmail.com

                                      *Admitted *pro hac vice*.

                                      *Counsel for Plaintiffs*

---

[26] Roger Sherman of Connecticut described the right as "the privilege of every citizen, [it being] one of his most essential rights, to bear arms, and to resist every attack upon his liberty or property, by whomsoever made." Pennsylvania Packet (Dec. 21, 1790), *in* 14 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS 92–93 (William C. diGiacomantonio, *et al*. eds., 1996).

## <u>CERTIFICATE OF SERVICE</u>

On June 6, 2011, I electronically submitted the foregoing document with the clerk of court for the U.S. District, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

<u>s/ Charles J. Cooper</u>
Charles J. Cooper